# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 14-0459

═══════════════

HOUSTON BELT & TERMINAL RAILWAY CO.,
BNSF RAILWAY CO., AND UNION PACIFIC RAILROAD CO.,
PETITIONERS,

v.

CITY OF HOUSTON, TEXAS AND DANIEL KRUEGER, IN HIS
OFFICIAL CAPACITY AS DIRECTOR OF PUBLIC WORKS AND ENGINEERING,
RESPONDENTS

═══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════

**Argued October 13, 2015**

JUSTICE BROWN delivered the opinion of the Court.

JUSTICE LEHRMANN filed a concurring opinion.

Governmental immunity protects political subdivisions of the state, such as cities and their officers, from liability. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). An important justification for this immunity is pragmatic: it shields "the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Yet the pragmatic rationale supporting this immunity also helps to delineate its limits—"extending immunity to officials using state resources in violation of the law would not

be an efficient way of ensuring those resources are spent as intended." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Thus, this Court has long recognized that governmental immunity does not bar claims alleging that a government officer acted *ultra vires*, or without legal authority, in carrying out his duties. *Id.* at 371–72.

This case concerns the breadth of this *ultra vires* doctrine.[1] Specifically, it presents the question of whether a suit complaining "of a government officer's exercise of [limited] discretion" by alleging "that the officer acted without legal authority" is a viable *ultra vires* claim. *See Heinrich*, 284 S.W.3d at 372. We conclude that it is. Although governmental immunity justifiably provides broad protection to the government and its agents, it does not protect *every* act by a government officer that requires some exercise of judgment—a government officer with some discretion to interpret and apply a law may nonetheless act "without legal authority," and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself. To the extent that the court of appeals held differently, we reverse that part of its judgment and remand this case to the trial court for further proceedings consistent with this opinion.

## I

In 2011, the City of Houston enacted a drainage-fee ordinance, which was proposed as a "pay-as-you-go" system to improve the city's drainage. *See* HOUSTON, TEX., CODE OF ORDINANCES

---

[1] We have often referred to the *ultra vires* doctrine as an exception to governmental and sovereign immunity, and we continue to do so today. However, some clarification is warranted. Our usage should not be read to imply that governmental immunity applies and that *ultra vires* is then an exception to that application; rather, when a governmental officer is sued for allegedly *ultra vires* acts, governmental immunity does not apply from the outset. Thus, our *ultra vires* cases do not run afoul of our long-standing recognition that "it is the Legislature's sole province to waive or abrogate sovereign immunity." *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002) (quoting *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997)) (internal quotation marks omitted).

ch. 47, art. XIV (2011).[2] Under the ordinance, drainage charges are imposed on properties within the city to "recover the city's cost in furnishing drainage for any benefitted property and the cost of funding future drainage system improvements," and any monies collected are to be used exclusively for "expenses associated with the cost of service to provide drainage services within the service area." *Id.* §§ 47-802, 47-821. Such charges are calculated based on a specified rate per "square [foot] of impervious surface on each benefitted property." *Id.* § 47-822(c).

The ordinance gives the city's Director of Public Works and Engineering—in this case, Daniel Krueger—authority to administer its provisions, subject to the terms of the ordinance itself. *Id.* §§ 47-805, 47-824 (the director "shall be responsible for the administration of this article including, but not limited to, enacting any procedures or policies necessary for the administration of the drainage system and the drainage charges . . . subject to the provisions of this article" and "shall establish and implement a system of verification and correction of drainage charges for each property subject to the drainage charges."). However, the ordinance also provides guidance as to the scope and limits of Krueger's authority. As is especially relevant here, it provides definitions for both "benefitted property" and "impervious surface":

> *Benefitted property* means a lot or tract to which drainage service is made available under this article and which discharges into a street, creek, river, slough, bayou, culvert, conduit, inlet, or other channel that forms part of the city drainage utility system.

---

[2] After the court of appeals issued its decision in this case, the Houston city council amended the ordinance. The city argues that we should consider the amended ordinance in construing Krueger's authority as it relates to determining which properties are "benefitted" and which surfaces are "impervious." However, the amendments in question change rather than clarify Krueger's authority. The city cites no authority tending to show why we should consider the amendments. Thus, we construe the ordinance as it read when Krueger proposed the drainage charges at issue and do not consult the recent amendments to clarify the ordinance's original language. *See Tijerina v. City of Tyler*, 846 S.W.2d 825, 827–28 (Tex. 1992) (courts can consider later-adopted amendments if they clarify but do not change the law).

. . .

> *Impervious surface* means any area that has been compacted or covered such that it does not readily absorb water or does not allow water to percolate through to undisturbed underlying soil strata. Surface materials considered impervious shall include, but not be limited to, bricks, pavers, concrete, asphalt, compacted oil-dirt, compacted or decomposed shale, oyster shell, gravel, or granite, and other similar materials. Surface features utilizing such materials and considered impervious shall include, but not be limited to, decks, foundations . . . , building roofs, parking and driveway areas, sidewalks, compacted or rolled areas, paved recreation areas, swimming pools, and other features or surfaces that are built or laid on the surface of the land and have the effect of increasing, concentrating, or otherwise altering water runoff so that flows are not readily absorbed.

*Id.* § 47-802. As to "impervious surface," the ordinance additionally provides that the "area of impervious surface on each benefitted property shall be determined on the basis of digital map data associated with tax plats and assessment rolls or other similar reliable data as shall be determined by the director." *Id.* § 47-822(d).

Shortly after the ordinance was enacted, petitioners Houston Belt & Terminal Railway, BNSF Railway, and Union Pacific Railway (collectively, the "railroads") received notices of proposed charges for their properties in Houston. The charges, proposed by Krueger, were about $3 million annually based on Krueger's determination that all of the railroads' properties within Houston were "benefitted" and that the surfaces of nearly all of those properties were also "impervious." As to "impervious surface," Krueger made his determination based upon aerial images—looking to see if the properties appeared green or brown—rather than digital map data. Generally, under this method, if the property appeared brown, Krueger determined it was impervious; if it appeared green, he determined it was pervious. Using this brown-or-green method, Krueger determined that about 93 million square feet of the railroads' properties were impervious. On the other hand, the railroads'

4

have pointed out that Houston's digital map data shows that only 72,364 square feet of the railroads' properties were impervious. It follows that the use of digital map data would have yielded significantly lower charges on the railroads' properties.

Pursuant to the ordinance, after receiving the notice of proposed charges, the railroads submitted requests for verification and correction of Krueger's proposed charges, contending Krueger had improperly proposed charges on properties that were not benefitted and on surfaces that were not impervious. After a hearing panel upheld Krueger's decision, the railroads filed suit against the city and Krueger in his official capacity,[3] alleging *ultra vires* claims against Krueger and seeking prospective injunctive relief.[4] The city filed a plea to the jurisdiction as to the railroads' *ultra vires* claims based on governmental immunity. Without holding an evidentiary hearing, the trial court sustained the city's plea. The railroads moved for clarification of the court's order and sought an opportunity to amend. The trial court denied their motion.

The railroads filed an interlocutory appeal. The court of appeals examined the two *ultra vires* questions: whether Krueger acted outside his authority by (1) determining that certain properties were benefitted and thus subject to drainage charges and (2) determining that the railroads should pay roughly $3 million based on their benefitted properties' impervious surface area. *Houston Belt & Terminal Ry. v. City of Houston*, 424 S.W.3d 663, 667–68 (Tex. App.—Houston [14th Dist.] 2014). The court of appeals affirmed in part and reversed in part, concluding that the railroads

---

[3] This opinion refers to "the city" when referring to arguments made by the city on Krueger's behalf.

[4] *See Heinrich*, 284 S.W.3d at 373, 376 ("Even if [an *ultra vires*] claim may be brought, the remedy may implicate immunity. . . . [Generally],"a claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction.").

5

pleaded a viable *ultra vires* claim challenging Krueger's determination that their properties were benefitted, but that they had not pleaded a viable *ultra vires* claim contesting Krueger's determination that the railroads' properties were impervious. *Id.* at 673. As to its second holding, the court reasoned that because "the enacting body intended to grant [Krueger] the ability to exercise his discretion," the railroads' allegations regarding imperviousness did not fall within the *ultra vires* exception and were barred. *Id.* at 672. The parties cross-appealed, and we granted review to determine whether Krueger's actions were *ultra vires* under *Heinrich* and its progeny.[5]

## II

Generally, "immunity from suit implicates courts' subject-matter jurisdiction." *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012). Thus, it "is properly asserted in a plea to the jurisdiction." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). As subject-matter jurisdiction is a question of law, we review a trial court's ruling on a plea to the jurisdiction de novo. *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015). "When a plea to the jurisdiction challenges the pleadings," as here, "we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Heinrich*, 284 S.W.3d at 378 (internal quotation marks omitted). In doing so, we construe the pleadings liberally in the pleaders' favor and look to their intent. *Id.* Only if the pleadings affirmatively negate jurisdiction should the plea to the jurisdiction be granted without affording the plaintiffs an opportunity to replead. *Miranda*, 133 S.W.3d at 227.

---

[5] The railroads additionally argue that the city is not immune here because its operation of the drainage utility is a proprietary function. *See Tooke*, 197 S.W.3d at 343. However, given our resolution of the *ultra vires* issues, we need not address this argument.

# III

The city contends that governmental immunity bars the railroads' claims because Krueger acted pursuant to the authority granted to him under the ordinance, and so the trial court properly granted the city's plea to the jurisdiction. The railroads argue their claims allege that Krueger's "benefitted property" and "impervious surface" determinations were made "without legal authority" under the ordinance and therefore are not barred by governmental immunity. While the parties disagree on the authority granted to Krueger under the ordinance, the resolution of their dispute hinges upon the meaning of our *ultra vires* jurisprudence.

As already noted, while governmental immunity provides broad protection to the state and its officers, it does not bar a suit against a government officer for acting outside his authority—*i.e.*, an *ultra vires* suit. *See Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 393 (Tex. 2011). "To fall within this *ultra vires* exception," however, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372; *see also Fed. Sign*, 951 S.W.2d at 404 ("[A]n action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars.").

The parties dispute the meaning of "exercise of discretion" and "without legal authority" as used in *Heinrich*. The city contends that under *Heinrich*, Krueger's determinations cannot be *ultra vires* if he had *some* discretion to make them under the ordinance. To the city, "exercise of discretion" means *any* decision made in which the officer has the authority to use his personal

7

judgment, and "a mistake in exercising his judgment is not an *ultra vires* act." Thus, because the ordinance granted Krueger authority to make "benefitted property" and "impervious surface" determinations, his determinations are discretionary and, as a matter of law, cannot be the subject of an *ultra vires* suit. Of course, the railroads urge a different understanding of *Heinrich*. The type of discretion that immunity protects, they argue, is *absolute* discretion—discretion where no specific, substantive, or objective standards govern the exercise of judgment. Therefore, regardless of whether Krueger had *some* authority or discretion, his determinations are still *ultra vires* because he acted beyond his granted discretion in making them. Ultimately, we conclude that our caselaw, along with the purposes underlying governmental immunity and the *ultra vires* exception, favors the railroads' interpretation.

Because *Heinrich* is the major point of contention between the parties, we start there. In *Heinrich*, a police officer's widow—Heinrich—brought an action against El Paso's Firemen & Policemen's Pension Fund Board officers, among other defendants, alleging that the officers acted outside their statutory authority by retroactively reducing her pension benefits. 284 S.W.3d at 369. The relevant statute provided the officers authority to "make from time to time" certain modifications, including "modify[ing] or chang[ing] prospectively or retroactively in any manner whatsoever any of the benefits provided by this Act, except that any retroactive change or modification shall only increase pensions or benefits." *Id.* at 378. Importantly, therefore, the officers being sued had authority—and at least *some* discretion—to modify benefits.

However, under that statute, "while benefits [could] be increased if certain procedures [were] followed, the Board [had] no discretion to retroactively lower pensions." *Id.* at 379. And so, because

8

she had alleged a retroactive reduction in her pension, Heinrich argued that her suit pleaded *ultra vires* acts and was not barred by immunity. We agreed. Recognizing our jurisprudence clearly established that suits seeking to require government officers to comply with the law are not barred by governmental immunity because noncompliance with the law is an *ultra vires* act, we clarified that exception. *See id.* at 371–72 (citing *IT-Davy*, 74 S.W.3d at 855–56; *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 841 (Tex. 1958); and *State v. Epperson*, 42 S.W.2d 228, 231 (Tex. 1931)). We held that to fall within the *ultra vires* exception, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372.

Because Heinrich had "allege[d] that petitioners violated [the law] when they reduced her benefits," we found that her claims against the pension board members were not barred. *Id.* at 371–78. To be sure, Heinrich's claim was against the officers for acting pursuant to, yet outside the limits of, a statutory grant of authority. In other words, Heinrich alleged that the officers, making the type of determination which they had authority to make, made that determination in a way the law did not allow. Thus, *Heinrich* cannot reasonably be read to limit *ultra vires* claims to those challenging ministerial acts, nor can it be read to shield every act undertaken by an officer who has some limited authority. *See id.*

Indeed, in the seven years since *Heinrich*, we have spoken a number of times on the intersection of the *ultra vires* exception and governmental immunity. In doing so, we have confirmed that *Heinrich* did not expand governmental immunity's reach or diminish the *ultra vires* exception by providing an absolute shield to limited as well as absolute discretion. *See, e.g.*, *Sw. Bell Tel., L.P.*

9

*v. Emmett*, 459 S.W.3d 578, 588–89 (Tex. 2015); *Klumb*, 458 S.W.3d at 9–11; *Sawyer Trust*, 354 S.W.3d at 393–94. In *Sawyer Trust*, for example, we were asked whether a navigability determination by an officer of the Parks and Wildlife Department—a department with "authority to make determinations on behalf of the State as to navigability of streams and to exercise the State's rights over navigable streambeds"—could be challenged via an *ultra vires* suit. 354 S.W.3d at 394. Noting the "untenable position" in which a landowner would find himself if the officer's navigability finding could not be challenged by an *ultra vires* suit, we held that it could. *See id.*[6] Similarly, in *Emmett*, we asked "whether [an officer's] anticipatory refusal to comply with the statute qualifies as a ministerial act *or was undertaken without legal authority*," thus reinforcing that *Heinrich* did not foreclose *ultra vires* suits alleging acts that were not ministerial yet were done without legal authority. *See* 459 S.W.3d at 588 (emphasis added). *Emmett*, however, did not require us to address the "without legal authority" question—because the authority granted in *Emmett* was a "purely ministerial duty," we found the plaintiff's allegations that the officer violated that duty were sufficient to plead an *ultra vires* claim. *Id.* at 589.

Of our recent cases, *Klumb* is most helpful to our inquiry here. *See* 458 S.W.3d at 9–11. There, we evaluated a pension board's interpretation and application of Article 6243h of the Texas Revised Civil Statutes. *Id.* The issue was "whether the pension board acted without legal authority by expanding Article 6243h's definition of 'employee' without the City's approval and in conflict

---

[6] We recognize that *Sawyer Trust* noted that "the question of navigability is, at bottom, a judicial one." *Id*. at 394. While this rule was a factor in our analysis in *Sawyer Trust*, that case is also properly understood as allowing an *ultra vires* claim to challenge a determination within the authority of a state officer because that officer allegedly made that determination without statutory or constitutional authority. *See id.* at 393–94.

with the plain language of the statute." *Id.* at 9. We ultimately found that the pension board's acts were not "without legal authority" so as to be *ultra vires*. *Id.* at 10–11.

Our holding in *Klumb*, however, was not that government officers charged with administration can perform their duties "in conflict with the plain language of [their enabling] statute" whenever they might please with no threat of judicial review. *See id.* at 9. Rather, we only concluded that no *ultra vires* claim had been pleaded after noting that "[t]he breadth of the pension board's authority under Article 6243h [was] inescapable" and after recognizing the express authorization for the pension board to "construe the statute, add language it deems necessary for the administration of the pension fund, and determine all eligibility questions and all other legal and factual matters pertaining to the fund's administration." *Id.* at 10. Moreover, the statute barred judicial review "absent a manifest conflict with express statutory terms." *Id.* As there was no manifest conflict, we noted that "any further consideration of the matter would impermissibly encroach on the unreviewable, discretionary authority afforded to the board under Article 6243h." *Id.* at 11.

And, as is especially relevant here, we were sure to emphasize that our holding did not diminish the *ultra vires* exception: "[a]lthough the pension board ha[d] unquestionably broad discretionary authority under [the statute], we caution[ed] that the board [could] not violate the statute." *Id.* Even under the board's "unquestionably broad discretionary authority," we acknowledged "the possibility that, in appropriate circumstances, a particular interpretation of the statute could be *ultra vires.*" *Id.*

11

* * *

These cases affirm that while the protections of governmental immunity remain robust, they are not absolute. As we said in *Heinrich*, governmental immunity protects exercises of discretion, but when an officer acts beyond his granted discretion—in other words, when he acts without legal authority—his acts are not protected. Thus, "discretion," as we have used the term in this context, cannot mean *limited* discretion that is otherwise constrained by the principles of law. *See, e.g.*, BLACK'S LAW DICTIONARY 565 (10th ed. 2014) (defining "judicial discretion" as "[t]he exercise of judgment . . . guided by the rules and principles of law"). Rather, our *ultra vires* caselaw uses the term in its broad sense. *See, e.g.*, *id.* (defining "discretion" as "the power of free decision-making"). Accordingly, the principle arising out of *Heinrich* and its progeny is that governmental immunity bars suits complaining of an exercise of *absolute* discretion but not suits complaining of *either* an officer's failure to perform a ministerial act *or* an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act. Only when such absolute discretion—free decision-making without any constraints—is granted are *ultra vires* suits absolutely barred. And, as a general rule, "a public officer has no discretion or authority to misinterpret the law." *Cf. In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding).

To be sure, absolute protection would go against the rationale for governmental immunity in the first place. Governmental immunity is premised in part on preventing suits that attempt to control state action by imposing liability upon the state. *See IT-Davy*, 74 S.W.3d at 855–56. But "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state." *Heinrich*, 284 S.W.3d at 372. Thus, prohibiting *ultra vires* suits when an officer acts

12

outside the bounds of his granted authority would run counter to the purposes behind immunity. Allowing such suits, on the other hand, encourages enforcement of existing policy. *See id.* And, while governmental immunity serves the pragmatic purpose of protecting public resources, we have recognized that extending immunity to officers who violate the law does not further that goal. *See id.* Accordingly, governmental immunity only extends to those government officers who are acting consistently with the law, which includes those who act within their granted discretion. *See id.*[7]

Because the *ultra vires* standard we clarify today hems closely to the purposes underlying governmental immunity and the *ultra vires* exception generally, it does not create a new vehicle for suits against the state to masquerade as *ultra vires* claims—indeed, our opinion merely reinforces the narrow *ultra vires* principles we have repeatedly announced and endorsed. *See Heinrich*, 284 S.W.3d at 372; *Fed. Sign*, 951 S.W.2d at 404; *Dodgen*, 308 S.W.2d at 842. Although only exercises of absolute discretion are absolutely protected, whether a suit attacking an exercise of limited discretion will be barred is dependent upon the grant of authority at issue in any particular case. And so many legislative grants of authority, although not absolute, will be broad enough to bar most, if not all, allegedly *ultra vires* claims. *See, e.g.*, *Klumb*, 458 S.W.3d at 11.

## IV

In light of this clarification, we look to the ordinance's language to determine whether the railroads have properly alleged that Krueger acted *ultra vires*. As noted above, the court of appeals held that the railroads properly alleged an *ultra vires* claim as to Krueger's "benefitted property"

---

[7] This standard is not to be confused with that for official immunity. While governmental immunity only protects an officer *in his official capacity* up until he acts "without legal authority," official immunity may more broadly protect him when sued *in his personal capacity*. *See, e.g.*, *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653–55 (Tex. 1994).

13

determination but not as to his "impervious surface" determination. Construing the pleadings liberally in the railroads' favor, we hold that they have alleged viable *ultra vires* claims as to both of Krueger's determinations. Accordingly, we affirm in part and reverse in part.

**A**

We apply rules of statutory construction to construe municipal ordinances. *Bd. of Adjustment v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Our primary objective in construing the ordinance is to ascertain and give effect to the enacting body's intent. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern that intent, we start with the plain and ordinary meaning of the ordinance's words, using any definitions provided by the enacting body. *See Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). We read the ordinance as a whole, presuming the enacting body purposefully included each word, *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008), and construing the ordinance to avoid rendering any word or provision meaningless. *Kallinen v. City of Houston*, 462 S.W.3d 25, 28 (Tex. 2015) (per curiam). When clear, the text is determinative of the enacting body's intent unless the plain meaning produces an absurd result. *Ruttiger*, 381 S.W.3d at 452.

**B**

The railroads pleaded that a number of their properties do not make use of the city's drainage system but instead discharge directly into natural bayous not owned or controlled in whole or in part by the city. They therefore argue that Krueger acted *ultra vires* in identifying such properties as benefitted. The court of appeals agreed. Relying on its holding in a companion case, *City of Houston v. Little Nell Apartments*, it held that "if, as the Railroads have pleaded, their properties do not fit

14

within the definition of 'benefitted property' because they do not make use of the City's drainage system," then Krueger does not have authority and discretion to impose drainage charges on the railroads' properties. *Houston Belt*, 424 S.W.3d at 669 (citing *City of Houston v. Little Nell Apartments*, *L.P.*, 424 S.W.3d 640 (Tex. App.—Houston [14th Dist.] 2014)). Construing the pleadings in favor of the railroads, the court of appeals then found that the railroads had pleaded a viable *ultra vires* claim. *See id.* We agree.

The ordinance charges Krueger with "administration of [the ordinance] including, but not limited to, enacting any procedures or policies necessary for the administration of the drainage system and the drainage charges . . . in accordance with and subject to the provisions of [the ordinance]." *See* CODE OF ORDINANCES § 47-805. The city argues that "administration" implies a broad grant of authority and discretion, citing dictionary definitions of "administration" and "ministerial." It argues that because Krueger has authority to administer, he necessarily has authority to interpret "benefitted property," and so his determination—even if wrong—cannot be *ultra vires.* However, under our jurisprudence, only absolute grants of authority and discretion will totally bar judicial review. If Krueger's authority is less than absolute, then he acts *ultra vires* if he acts outside of his limited authority. Here, as is generally the case, the limits of Krueger's authority are found in the authority-granting law itself—the ordinance.

The ordinance was enacted "to enhance, improve and renew the City's drainage systems and streets." *See id.* at pmbl. Such improvement is to be funded by "establish[ing] a schedule of drainage charges against all real property in the city subject to such charges under [the ordinance]" and then "provid[ing] drainage for all real property in the city on payment of drainage charges unless the

15

property is exempt from such payment as provided herein." *Id.* § 47-801. The drainage charges, imposed "[t]o recover the city's cost of service to provide drainage to benefitted properties," are calculated by multiplying an applicable rate "by the area in square feet of impervious surface on each benefitted property." *Id.* §§ 47-822(a), (c). And "drainage charge" is defined as "the charge imposed by the city herein, including penalties, to recover the city's cost in furnishing drainage for any benefitted property and the cost of funding future drainage system improvements." *Id.* § 47-802. Accordingly—and the city does not now argue otherwise—a property must meet the definition of "benefitted property" before charges may be assessed on it. *See Little Nell*, 424 S.W.3d at 650–53 ("[T]he expressed purpose of the drainage charge is to recover the cost of service associated with providing drainage to 'benefitted properties.'").

"Benefitted property" is defined as "a lot or tract to which drainage service is made available under this article and which discharges into a street, creek, river, slough, bayou, culvert, conduit, inlet, or other channel that forms part of the city drainage utility system." CODE OF ORDINANCES § 47-802. From this definition, two things are plainly required for a property to qualify as benefitted: (1) drainage service must be made available and (2) it must discharge into the city drainage utility system. *See id.* Even so, the city claims that *all* properties within Houston, unless exempt, are benefitted under the ordinance. But this argument is contradicted by the ordinance's plain language. To supplement the definition of "benefitted property," which requires that drainage discharge into the drainage system, the ordinance defines "drainage system" as "drainage owned or controlled in whole or in part by the city and dedicated to the service of benefitted property." *Id*. "Drainage," on the other hand, is broadly defined to include various waterways, "whether natural or artificial," and

16

is broad enough to include bayous. *Id.* Indeed, the definition of "benefitted property" includes the term "bayou." *Id.* But, for a property to be benefitted, the drainage to which it discharges must *also* be part of the drainage system—it must be "owned or controlled in whole or in part by the city and dedicated to the service of benefitted property." *Id.* Therefore, to read "drainage system" broadly to include all drainage in Houston, as the city does, renders meaningless the broad definition of "drainage"—if all drainage is also part of the drainage system, why is drainage separately defined and used throughout the ordinance? As the plain language of the definitions of "drainage" and "drainage system"—which are different—confirms, "drainage system" cannot mean the same thing as "drainage." *See TGS-NOPEC*, 340 S.W.3d at 439 ("We . . . consider statutes as a whole rather than their isolated provisions."). It follows that even though a property that discharges into a bayou *may also* be benefitted (because a bayou *may* be part of the drainage system), the fact that it discharges into a bayou is not by itself sufficient to make any given property benefitted (because a bayou is not *necessarily* part of the drainage system).

Reading "benefitted property" to mean "all properties within Houston" also renders a large part of that definition meaningless. Indeed, under the city's construction, the definition of "benefitted property" is mostly unnecessary: to construe "benefitted property" as the city does—to mean all properties within Houston—would render "and which discharges into a street, creek, river, slough, bayou, culvert, conduit, inlet, or other channel that forms part of the city drainage utility system" meaningless. *See* CODE OF ORDINANCES § 47-802. On this point, therefore, we agree with the court of appeals in *Little Nell* that "the ordinance consistently qualifies that drainage charges are only to be imposed where drainage is provided to 'benefitted properties'" and that the enacting body would

17

not have particularly defined "benefitted property" and consistently used it throughout the ordinance if its true intent was that all real property within Houston was to be presumptively benefitted and assessed charges. *See* 424 S.W.3d at 652; *see also Kallinen*, 462 S.W.3d at 28.

The *Little Nell* court of appeals also found that the ordinance "does not contain any language indicating—even if the director has the authority to make [benefitted property] determinations—that he personally decides which properties are 'benefitted.'" 424 S.W.3d at 654. We agree. Unlike *Klumb*, where the breadth of the pension board's authority and discretion was "inescapable," Krueger's authority here is explicitly limited. *See Klumb*, 458 S.W.3d at 10.[8] The provision granting Krueger authority provides that he must administer the ordinance "in accordance with and subject to [its] provisions." CODE OF ORDINANCES § 47-805. The ordinance expressly defines "benefitted property," and no language in the ordinance grants Krueger discretion to interpret "benefitted property"—or any other definition—in a way that is contrary to the definition itself. *Cf. Klumb*, 458 S.W.3d at 10. Accordingly, we conclude that while Krueger may have some authority with respect to determining which properties are benefitted, he does not have authority to make that determination in a way that conflicts with other provisions of the ordinance, including its definition and usage of "benefitted property."

The railroads' pleadings allege that their properties are not "benefitted" because they do not make use of the city's drainage system but rather discharge into natural bayous not owned or

---

[8] For example, the statute in *Klumb* expressly granted the pension board authority to, among other things, "adopt . . . written rules and guidelines; . . . interpret and construe [the act;] . . . correct any defect, supply any omission, and reconcile any inconsistency that appears in [the act] in a manner and to the extent that the pension board considers expedient to administer [the act] for the greatest benefit of all members; [and] determine all questions, whether legal or factual, relating to eligibility for membership, service, or benefits or relating to the administration of the pension fund." TEX. REV. CIV. STAT. art. 6243h, § 2(x); *Klumb*, 458 S.W.3d at 4–5.

18

controlled by the city. And they allege that Krueger thus acted *ultra vires* in classifying the railroads' properties as benefitted without reference to the definition of "benefitted property" provided by the ordinance. Under the ordinance, natural bayous are not, as a matter of law, within the definition of "drainage system," and the city did not bring forth any jurisdictional evidence to rebut the railroads' allegations. Therefore, construing the pleadings liberally in the railroads' favor, we find that the pleadings affirmatively allege an *ultra vires* claim. *See Heinrich*, 284 S.W.3d at 378. Accordingly, we affirm the court of appeals on this issue.

C

The railroads next contend they have properly pleaded that Krueger acted *ultra vires* in determining the "impervious surface" of their properly identified benefitted properties. The court of appeals, citing Krueger's authority to determine, adjust, review, and correct the amount of impervious surface on any given property, determined that the ordinance "grants [Krueger] authority with regard to the determination of 'the area of impervious surface on each benefitted property.'" *Houston Belt*, 424 S.W.3d at 671. Then, finding that "[t]he plain language of the definition of 'impervious surface' . . . does not preclude all 'room for judgment' or 'room for discretion' in determining what additional 'similar' surface materials and 'other' surface features would meet the definition," the court of appeals concluded that "the enacting body intended to grant [Krueger] the ability to exercise his discretion" in making "impervious surface" determinations. *Id.* at 672. Therefore, the court of appeals held that "because the Railroads only have alleged facts demonstrating acts within Krueger's legal authority and discretion under the ordinance, their claim seeks to control state action, and thus it is barred by sovereign immunity." *Id.* at 673. We disagree.

19

The question is not, as the court of appeals framed it, whether Krueger was granted "the ability to exercise his discretion." Rather, the question we must ask is whether the enacting body intended to grant Krueger *absolute* discretion as to "impervious surface" determinations or, if it did not, whether the railroads alleged that Krueger acted beyond the limits of the discretion he was actually granted. Again, this question requires us to determine how much authority and discretion the ordinance granted Krueger.

As discussed above, the ordinance provides that drainage charges are to be calculated by multiplying an applicable rate "by the area in square feet of impervious surface on each benefitted property." CODE OF ORDINANCES § 47-822(c). "Impervious surface" is defined as "any area that has been compacted or covered such that it does not readily absorb water or does not allow water to percolate through to undisturbed underlying soil strata." *Id.* § 47-802. Krueger is granted authority as to impervious surface determinations throughout the ordinance. *See, e.g.*, *id.* §§ 47-805 (authority to adjust impervious surface calculations downward); 47-822(d) (authority to determine types of data to use in determining impervious surface); 47-823 (authority to "on a regular basis review available data to verify the amount of impervious surface"); 47-824(a) (authority to "establish and implement a system of verification and correction of drainage charges"). Most pertinent to our analysis is section 47-822(d), which provides that "[t]he area of impervious surface on each benefitted property shall be determined on the basis of digital map data associated with tax plats and assessment rolls *or other similar reliable data as shall be determined by [Krueger]*." *Id.* § 47-822(d) (emphasis added).

20

As the court of appeals properly noted, these sections—especially the "as shall be determined by [Krueger]" language—make clear that Krueger had authority to determine "impervious surface," and specifically to decide what constitutes "other similar reliable data" and when he shall utilize such data in determining "impervious surface." *Houston Belt*, 424 S.W.3d at 672. And indeed, the court of appeals properly found that the ordinance did not preclude all "room for judgment" or "room for discretion." *Id.* But while Krueger clearly had authority, and while he clearly had to use *some* judgment in determining "impervious surface," the court of appeals stopped short of asking whether his authority might nonetheless have some limits. If the court of appeals was correct to stop there, the ordinance must be read to give Krueger unbridled discretion to determine the types of data he relies upon in determining "impervious surface." But that reading is hard to square with the ordinance, which lays out the specific types of data Krueger may use in his determination: "digital map data" or "other similar reliable data." *See* CODE OF ORDINANCES § 47-822(d). If Krueger may unilaterally determine the type of data he will rely upon, then section 47-822(d)'s "digital map data" and "other similar reliable data" are without meaning. *See id.* Therefore, like the city's reading of "benefitted property," its reading of "impervious surface" "violates [the] duty of statutory interpretation to 'give effect to all the words of [an ordinance] and not treat any [such] language as surplusage if possible.'" *Kallinen*, 462 S.W.3d at 28 (quoting *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987)).

Indeed, the more natural reading of section 47-822(d)—and the reading that gives effect to each word—is that it imposes specific restraints upon the type of data that can be used in determining "impervious surface." Here, it is undisputed that Krueger did not use digital map data.

21

Thus, we must determine how "similar reliable data" restrains Krueger's choice of data. Not surprisingly, the ordinance does not define "similar reliable data." The common meaning of "similar reliable data" is data that is "alike in substance" and "fit to be relied upon." *See* MERRIAM-WEBSTER DICTIONARY & THESAURUS 669, 769 (2014). Under this common meaning of "similar reliable data," therefore, Krueger's authority to determine what data to use was limited—he must have chosen data "alike in substance" to digital map data that was also "fit to be relied upon."

In their pleadings before the trial court, the railroads argued that Krueger's aerial photography approach—which they now characterize as, "if it is green, it must be pervious"—is necessarily unreliable: under it, anything green, even artificial turf, will be found to be pervious; anything brown, even sandy areas with no vegetation, will be found to be impervious. Thus, the railroads contended that Krueger's chosen method failed to produce results consistent with the ordinance's definition of "impervious surface." Their properties, they argued, contained significantly less impervious surface than Krueger had determined—indeed, they were "designed, engineered, and built so that [they] readily absorb[] water and allow[] water to percolate to the undisturbed underlying soil strata."

The city countered that Krueger acted within his discretion in choosing to use aerial data, even if it ultimately resulted in improperly classifying pervious surfaces as impervious. Thus, the city argues that even if Krueger had determined brown grass was impervious, his determination would be protected by governmental immunity. However, the city assumes an incorrect view of the standard for alleging an *ultra vires* claim under *Heinrich.* Under the proper standard, the railroads need only to allege that Krueger acted outside his discretion by using an unreliable or dissimilar method to classify their properties as impervious. Here, we need not conclusively decide that aerial photography

22

is dissimilar to digital map data or otherwise unreliable. In light of the railroads' allegations that use of digital map data would in fact yield a significantly lower area of impervious surface on their properties than Krueger's aerial-photography method, and that Krueger's chosen method led to an improper classification of areas not meeting the "impervious surface" definition as impervious, our standard of review leads us to infer unreliability and dissimilarity in this case. *See Heinrich*, 284 S.W.3d at 378; *Miranda*, 133 S.W.3d 226–27. Accordingly, construing the pleadings liberally in favor of the railroads, we find that the railroads' pleadings are sufficient to confer the trial court with jurisdiction over their claim that Krueger acted *ultra vires* in determining the impervious surface of their properties.

\* \* \*

The railroads' pleadings affirmatively allege that Krueger acted "without legal authority" in both his "benefitted property" and "impervious surface" determinations, and thus they have alleged viable *ultra vires* claims as to each. *See Heinrich*, 284 S.W.3d at 372, 378. Accordingly, we reverse the court of appeals' judgment in part and remand this case to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: April 1, 2016

23