**Reversed and Rendered and Majority and Concurring Opinions filed April 3, 2025**



**In The**

# Fifteenth Court of Appeals

---

### NO. 15-24-00007-CV

---

### MIKE MORATH IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF EDUCATION, Appellant

### V.

### KINGSVILLE INDEPENDENT SCHOOL DISTRICT, ET AL., Appellees

---

**On Appeal from the 419th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-23-004675**

---

### OPINION

Despite state law requiring annual A to F performance ratings for Texas public schools, no ratings have been issued for five years—none in 2020 and 2021 due to COVID-19, none as to low-performing schools in 2022 for the same reason, and none in 2023 or 2024 due to temporary injunctions issued by two Travis County

courts. In this appeal involving the 2023 ratings, the primary argument of the Plaintiff and Intervenor school districts ("the Districts"[1]) is that the Commissioner of Education has no legal authority to retroactively issue ratings based on standards adopted after a school year ends, thereby depriving them of an opportunity to improve their grades.

But Chapter 39 of the Texas Education Code gives the Commissioner broad legal authority "to adopt rules to evaluate school district and campus performance," and to assign each district and school a rating of A (exemplary), B (recognized), C (acceptable), D (needs improvement), or F (unacceptable).[2] The Chapter requires the Commissioner to solicit input from school boards, administrators, teachers, and parents in establishing and implementing this system.[3] But it also gives him broad discretion that, along with the general immunity from suit provided to all state officials, was intended to keep academic ratings "out of the courts."[4]

For the reasons noted below, we hold the trial court erred by declining to dismiss this suit and instead temporarily enjoining issuance of the 2023 ratings. We vacate the trial court's orders, dissolve the temporary injunction, and render judgment dismissing this suit for want of jurisdiction.

## Background

Mike Morath, in his official capacity as the Commissioner of Education, is the executive officer of the Texas Education Agency, a state agency comprised of

---

[1]      Where the school districts make different argument, they are referred to as "Plaintiffs" or "Intervenors."

[2]      *See* TEX. EDUC. CODE § 39.054(a). All citations hereafter in this opinion refer to Chapter 39 of the Texas Education Code unless otherwise noted.

[3]      *See* § 39.001(b).

[4]      *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 71 (Tex. 2018) (emphasis added).

the Commissioner and agency staff.[5] Texas law requires the Commissioner to publish annual performance ratings for each school district and campus by August 15 relating to the previous school year.[6] When the Commissioner failed to publish ratings or the rules and standards used to calculate them by that deadline in 2023, Plaintiffs and Intervenors representing 121 of the roughly 1,200 school districts in Texas filed suit for temporary and permanent injunctions to prevent him from issuing A to F accountability ratings thereafter.

The Commissioner filed a plea to the jurisdiction on October 5, 2023, requesting dismissal of the suit based on sovereign immunity. The trial court held an evidentiary hearing on both the Commissioner's plea to the jurisdiction and the Districts' request for a temporary injunction on October 23, 2023, and three days later denied the plea and granted the injunction. The Commissioner filed a notice of interlocutory appeal the next day.

Normally, the Commissioner's appeal would supersede the temporary injunction under Texas law.[7] To thwart that law, the trial court added an unusual clause purporting to enjoin supersedeas until the court of appeals could consider an emergency stay, which the Districts requested from the Third Court of Appeals the next business day.[8] On November 3, 2023, that court reimposed the district court's temporary injunction "pending the resolution of the School Districts' motions for emergency relief."[9] The Third Court took no further action until the appeal was

---

[5]  See TEX. EDUC. CODE §§ 7.002(a); 7.055(b)(2).

[6]  § 39.054(a-3).

[7]  See TEX. R. APP. P. 24.2(a)(3), 25.1(h), 29.1; TEX. CIV. PRAC. & REM. CODE § 6.001.

[8]  See TEX. R. APP. P. 29.3.

[9]  Morath v. Kingsville I.S.D., 2023 WL 7280257, at *1 (Tex. App.—Austin Nov. 3, 2023, order).

transferred to this Court ten months later. We set the appeal for oral argument at this Court's second setting on November 18, 2024.

## Discussion

As an official of state government, the Commissioner is immune from suit absent waiver or exception.[10] The Districts bear the burden of affirmatively showing immunity does not apply.[11] Plaintiffs sought to avoid immunity on two grounds: several ultra vires acts they allege were beyond his legal authority (*see part I*), and declaratory and injunctive relief under the Uniform Declaratory Judgment Act (*see part II*).

## I. The Ultra Vires Claims

A viable ultra vires claim against a government official is an exception to sovereign immunity from suit.[12] An act is ultra vires if the official "acted without legal authority or failed to perform a purely ministerial act."[13] An act is "without legal authority" if it requires discretion or judgment and the actor "exceeds the bounds of that authority, or the conduct conflicts with the law itself."[14] An act is ministerial if "the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment."[15]

---

[10] *See, e.g., Honors Acad.*, 555 S.W.3d at 68.

[11] *City of Austin v. Powell*, 704 S.W.3d 437, 447 (Tex. 2024).

[12] *See Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 n.1 (Tex. 2016).

[13] *Id*. at 161.

[14] *Id*. at 158.

[15] *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)).

The Districts assert it would be ultra vires for the Commissioner to proceed to publish school ratings for the 2022–23 school year (A) *after* the August 15th deadline imposed by statute (§ 39.0541(a-3)); (B) *without* formal adoption and publication of standards and explanatory materials "during the school year" as required by statute (§§ 39.0541–.0542); and (C) *based on* STAAR tests that were not determined to be valid and reliable by an "independent" entity as required by statute (§ 39.023(a-11)). We address each in turn.

## A.     The August 15 deadline for performance ratings

> Not later than **August 15** of each year, the following information shall be made publicly available as provided by rules adopted under this section: (1) the performance ratings for each school district and campus; and (2) if applicable, the number of consecutive school years of unacceptable performance ratings for each district and campus. [*§ 39.054(a-3) (emphasis added)*]

Section 39.054 requires the Commissioner to publish performance ratings for schools and school districts by August 15th each year based on data from the previous school year. Due to disruptions related to COVID-19, no A to F ratings were issued for the 2019-20 and 2020–21 school years under disaster declarations issued by the office of the Governor,[16] and no D or F ratings were issued for 2021–22 by statute.[17] The 2022-23 school year ratings were delayed due to (a) legislation requiring changes to the STAAR test;[18] (b) a once-every-five-years "refresh" of the

---

[16]     *See* Texas Education Agency, *2020 Accountability System*, https://tea.texas.gov/texas-schools/accountability/academic-accountability/performance-reporting/chapters-1-11-2020-accountability-manual.pdf, p.5 (last visited Apr. 1, 2025); Texas Education Agency, *2021 Accountability System*, p. 3, https://tea.texas.gov/texas-schools/accountability/academic-accountability/performance-reporting/final-2021-accountability-manual.pdf (last visited Apr. 1, 2025).

[17]     § 39.0546.

[18]     *See* Act of May 27, 2019, 86th Leg., R.S., ch. 1315, §§ 3, 6, 2019 TEX. GEN. LAWS 3865, 3866-68 (codified at TEX. EDUC. CODE §§ 39.023(c-8), .0234).

accountability system; and (c) new growth data requiring adjustment of cutoff scores to create a useful baseline for future years. As complete 2023 STAAR results were unavailable until four days before the August 15th deadline, timely issuance was not possible.[19] The Plaintiff districts filed suit nine days later.

It is undisputed that the Commissioner did not release the 2022–23 school ratings by August 15th, or at any time before the trial court's temporary injunction on October 26, 2023. Due to that injunction, he has not released them since. Although the Districts pleaded this failure to meet the August 15th deadline, and questioned witnesses about it at the evidentiary hearing, on appeal Plaintiffs state they are not "overly concerned" about this "technicality." As this equivocal statement does not clearly waive the complaint, we address it briefly since "briefing waiver is generally disfavored."[20]

In *Morath v. Lampasas Independent School District*, an opinion issued while this case was on appeal, the Texas Supreme Court held that a similar chapter of the Education Code that imposed both a *duty* to act and a *deadline* for actions was mandatory, but not jurisdictional.[21] The statute in that case allowed appeals to the Commissioner of disputes about transferring property from one school district to another, and required him to issue a decision "not later than the 180th day after the date an appeal . . . is filed."[22] The Court held that both the statutory duty and the deadline to decide "are presumed to be nonjurisdictional absent clear legislative intent to the contrary," and that legislative intent should be determined from "the statute's plain meaning, any specific consequences for noncompliance, the statute's

---

[19]     The parties agree that no factor weighs more heavily in the A–F ratings than STAAR tests.

[20]     *Gill v. Hill*, 688 S.W.3d 863, 869 (Tex. 2024).

[21]     686 S.W.3d 725, 729 (Tex. 2024).

[22]     *See* TEX. EDUC. CODE § 7.057(b).

purpose, and each construction's resulting consequences."[23] The Court held that missing the statutory deadline in that case did not terminate the Commissioner's jurisdiction over the appeal because: (a) the text imposed "no specific consequences for noncompliance with the 180-day deadline"; (b) dismissal was not "logically necessary" to accomplish the statute's purpose;[24] (c) dismissal would "eviscerate" its purpose of providing administrative appeals; and (d) dismissal could encourage gamesmanship and intentional delay aimed at thwarting such appeals.[25] As the Court concluded: "Generally, a late decision on the merits is better than never."[26]

For the same reasons, we hold the August 15th deadline here for issuing school ratings was not jurisdictional. Nothing in Chapter 39 states any consequence for missing this deadline; the Legislature could have automatically terminated the Commissioner's authority to issue ratings after the deadline, but did not. The title of Chapter 39 ("Public School System Accountability") and most of its 28,000 words clearly prioritize "ratings" (used over 120 times) as the statute's purpose rather than "August 15" (used once). The statute itself allows the Commissioner to decline to issue an overall rating in cases of natural disaster, data failure, or "for other reasons outside the control of the district or campus."[27] This broad grant of discretion to the Commissioner to cancel ratings suggests he would not act ultra vires by exercising the lesser step of postponing them.

---

[23] *Lampasas I.S.D.*, 686 S.W.3d at 742–43.

[24] *See, e.g., Image API, LLC v. Young*, 691 S.W.3d 831, 841 (Tex. 2024) (holding courts should "decline to create a statutory consequence for noncompliance" that is neither "explicit in the text or logically necessary to accomplish the statute's purpose," as that "is the Legislature's job, not ours").

[25] *See Lampasas I.S.D.*, 686 S.W.3d at 743–45; *see also Tex. Educ. Agency v. Houston Indep. Sch. Dist.*, 660 S.W.3d 108, 118 (Tex. 2023).

[26] *Lampasas I.S.D.*, 686 S.W.3d at 743–44.

[27] § 39.054(a-4).

We do not hold that the Commissioner can violate Chapter 39 "at will," as the Intervenor districts suggest. Schools and the Commissioner have all faced unprecedented challenges in the last five years, yet prompt ratings remain critical to timely action by schools, districts, parents, students, and government officials in response. Cancelling ratings entirely is not "logically necessary" to accomplish the statute's purposes if postponing them would suffice; it would instead "eviscerate" the statute, sacrificing the substantive results for the procedural means. We hold the record does not support an ultra vires claim that the Commissioner automatically lost his legal authority to issue ratings after August 15th.

## B.    The deadline to adopt and explain ratings during the school year

The commissioner may adopt indicators and standards under this subchapter **at any time during a school year** before the evaluation of a school district or campus. *[§ 39.0541) (emphasis added)]*

**Each school year**, the commissioner shall provide each school district a document in a simple, accessible format that explains the accountability performance measures, methods, and procedures that will be **applied for that school year** …. *[§ 39.0542(a) (emphasis added)]*

**Annually**, the commissioner shall define the state standard **for the current school year** for each achievement indicator adopted under this section…. [T]he commissioner shall establish and modify standards to **continuously improve** student performance to achieve the goals of eliminating achievement gaps based on race, ethnicity, and socioeconomic status and to ensure this state is a national leader in preparing students for postsecondary success. *[§ 39.053(f) (emphasis added)]*

The Districts' primary complaint is that it would be "fundamentally unfair" to issue ratings for the 2022-23 school year based on standards that were not formally adopted or explained until several months *after* the school year ended. Specifically, they allege the Commissioner cannot publish 2022–23 ratings because he did not adopt and define the achievement indicators and standards at any time during the

2022–23 school year as required by Chapter 39,[28] or provide a document explaining the measures, methods, and procedures to be applied for that year as also required.[29] The Commissioner presented evidence that he released preliminary announcements about these matters in the spring of the 2022–23 school year,[30] but concedes they were not formally adopted until October 31, 2023,[31] several months after the school year ended and three days after the trial court's injunction.

There was much conflicting testimony in the trial court concerning whether and to what degree earlier notice would have made a difference in the 2022–23 ratings. The record reflects: (1) the major indicators were all known (STAAR tests,[32] student improvement on tests,[33] graduation rates,[34] end of course tests,[35] military enlistments,[36] and industry certifications[37]), but the critical cutoff scores to get an A, B, C, D, or F were not; (2) some of the measures, methods, and procedures that would appear in the final Accountability Manual were previewed to school districts in January, March, and May of 2023, but not all; (3) efforts to improve some indicators like industry certifications take more time to plan and implement than others; (4) some indicators like graduation rates and college or military enrollment are "lagging standards" taken not from the most recent school year but a previous

---

[28] *See* §§ 39.0541, 39.053(f).

[29] *See* § 39.0542.

[30] *See* 48 Tex. Reg. 2543, 2551 (May 19, 2023).

[31] *See* 48 Tex. Reg. 6497, 6593 (Nov. 10, 2023).

[32] §§ 39.023, 39.053(c)(1)(A)(i)–(ii).

[33] § 39.053(c)(2).

[34] § 39.053(c)(1)(B)(ix).

[35] § 39.023(c).

[36] § 39.053(c)(1)(B)(iv).

[37] § 39.053(c)(1)(B)(v).

one; and (5) some remedial steps like staffing, instructional technology and materials, professional development, and lesson planning may be implemented quickly while others take years.

But it is not our role as judges to decide whether the Commissioner's decisions were necessary or fair. The Districts' burden on their ultra vires claims was to show the Commissioner acted "without legal authority," not that he should have exercised his discretion another way.[38] On the precise issue here—the consequences (if any) of missing a statutory deadline—the Supreme Court said in *Lampasas* this was for the Legislature: "When the Legislature intends dismissal as a consequence, it generally says so."[39] Here it did not.

Nothing in Chapter 39 suggests that a delay in defining, adopting, or explaining the rules, indicators, or standards for the ratings in 2022–23 required cancelling the ratings altogether; the clear legislative intent in Chapter 39 is to *publish* school ratings, not *suppress* them. That is especially relevant when, as here, there is *no* precise deadline for adoption or explanation of the ratings standards— one section requires action "at any time during a school year,"[40] another at some time during "[e]ach school year,"[41] and the last "for the current school year."[42] These all give the Commissioner broad discretion regarding timing, broad enough to allow compliance up to the very last day of a school year. That prevents any implied requirement that districts must be given enough time to redirect resources *before* the school year ends. We cannot write into Chapter 39 an earlier or more

---

38    *Herrera v. Mata*, 702 S.W.3d 538, 541 (Tex. 2024).

39    *See Lampasas I.S.D.*, 686 S.W.3d at 744.

40    *See* § 39.0541.

41    *See* § 39.0542(a).

42    *See* § 39.053(f)).

specific deadline, or automatically cancel A to F ratings, when Chapter 39 does not.

The Plaintiff districts argue that retroactively setting standards after a school year ends violates § 39.054(b), which requires that performance evaluations must be "implemented in a manner that provides the mathematical possibility that all districts and campuses receive an A rating." We agree that after a race is over not everyone can be declared the winner. But the statute requires methods that provide a "mathematical *possibility*" for every school district to excel, not standards so low that every district will. The statute heavily weights academic ratings toward rewarding academic *improvement* rather than just academic *achievement*, so it is possible for all schools and districts to receive an A rating no matter how far behind some may start.[43] Retroactively setting standards so low that all can achieve an A would defeat the incentives for improvement at the heart of the system.

The Districts also complain that raising standards at the end of a school year will discourage students and teachers because the same efforts and achievements that would have earned a high grade last year may instead result in a lower one. We do not in the least overlook the pressures and sacrifices that school ratings impose on schools, teachers, and students. But increasingly rigorous standards is a *feature* rather than a *flaw* in the statute. Chapter 39 requires the Commissioner to "modify standards to *continuously improve* student performance" to ensure Texas is "a national leader in preparing students for postsecondary success."[44]

Finally, we have no authority to grant the Districts' alternative request that

---

[43]     At least 30% of an overall performance rating must be based on the "closing the gaps domain" (accounting for differentials in racial, ethnic, socioeconomic, or special education backgrounds), and the remainder is based on the higher of the "student achievement domain" (based on STAAR tests) or the "school progress domain" (based on comparative improvement on STAAR tests). *See* § 39.053(c)(3), 39.054(a-1).

[44]     § 39.053(f) (emphasis added).

we order the Commissioner to adopt a "hold harmless year" cancelling ratings due to the major changes that were taking place so the Districts would have time to adjust. The statute allows the Commissioner to issue "Not Rated" grades in cases of natural disaster, data failure, or "for other reasons outside the control of the district or campus."[45] But that discretion is granted solely to the Commissioner, not to schools, to districts, or to courts. The Commissioner's decision not to do so statewide for a fourth year in a row was delegated entirely to his discretion.[46] We conclude the Commissioner did not act ultra vires by declining to cancel all 2022–23 school ratings when he was unable to formally define, adopt, and explain all its aspects before the end of that school year.

## C.  The requirement that STAAR tests be independently validated

Before an assessment instrument . . . may be administered . . ., the assessment instrument must, on the basis of empirical evidence, be determined to be valid and reliable by an entity that is **independent** of the agency and of any other entity that developed the assessment instrument. *[§ 39.023(a-11) (emphasis added)]*

The commissioner shall appoint a **technical advisory committee** to advise the commissioner and the agency regarding the development of valid and reliable assessment instruments for purposes of this chapter . . . . The agency may compensate a member of the technical or educator advisory committee or reimburse the member for expenses incurred . . . . *[§ 39.02302(a), (c) (emphasis added)]*

---

[45]     *See* § 39.054(a-4)(4) ("Notwithstanding any other law, the commissioner may assign a school district or campus an overall performance rating of "Not Rated" if the commissioner determines that the assignment of a performance rating of A, B, C, D, or F would be inappropriate because . . . the performance indicators would not accurately reflect quality of learning and achievement for the district or campus.").

[46]     The Commissioner provided "what if" ratings that applied the 2023 standards to the 2022 data to help schools show whether ratings dropped due to changes in the system rather than decreasing raw scores. But whether, when, and how to raise standards was entrusted to his discretion.

Finally, the 59 Plaintiff districts (but not the 62 Intervenors) pleaded it would be ultra vires for the Commissioner to issue accountability ratings in 2023 based on the new STAAR tests for that year, as they were not "determined to be valid and reliable by an entity that is independent of the agency and of any other entity that developed the assessment instrument," as the statute requires.[47]

Section 39.02302 of the statute requires the Commissioner to appoint a "technical advisory committee . . . to advise the commissioner and the agency regarding the development of valid and reliable assessment instruments."[48] He appointed the Texas Technical Advisory Committee (TAC), a panel "comprised of nationally recognized experts" that is "independent of [TEA] and of any other entity that developed the assessment instrument."[49] The TAC reviewed the changes and implementation of the 2022–23 changes to the STAAR test, and concluded they "would not be a threat to the validity and reliability of the assessment." Plaintiffs offered no expert testimony otherwise.

Instead, Plaintiffs argued the TAC's assessment was not "independent" because its members were appointed by the Commissioner and may be compensated by TEA.[50] The statute does not define "independent," but the ordinary meaning of the word is "not subject to control by others."[51] "Independent contractors" are hired

---

[47]    § 39.023(a-11).

[48]    § 39.02302(a).

[49]    *See also* § 39.023(a-14) (setting aside time limits on tests if, as a result, the test is no longer "valid and reliable, based on findings and recommendations made by the *advisory committees* established under Section 39.02302." (emphasis added)).

[50]    § 39.02302.

[51]    *See Independent*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 633 (11th ed. 2020); *see also Tex. Health & Hum. Servs. Comm'n v. Estate of Burt*, 689 S.W.3d 274, 280–81 (Tex. 2024) ("To determine a statutory term's common, ordinary meaning, we typically look first to [its] dictionary definitions.").

and paid by others who do not control their work;[52] "independent agencies" are those "not under the direction of the executive" branch;[53] and "independent courts" are not controlled by the other branches of government even though the judges may be paid or appointed by them. Thus, the relevant test here is whether the TAC's work and conclusions were under the control of the Commissioner or TEA. Plaintiffs point to no evidence in the record showing that.

Read as a whole, other provisions in Chapter 39 make clear that "independent" does not depend on who appointed or paid the TAC members, but on preventing potential conflicts of interest between those who *develop* STAAR tests and those who *validate* them. Chapter 39 prohibits the Commissioner from appointing persons to the TAC who are "retained or employed by an assessment instrument vendor."[54] The statute makes it a crime (Class B misdemeanor) for a member of the TAC to also be "an agent of an entity that has been contracted to develop or implement assessment instruments."[55] And it expressly authorizes TEA to "compensate" or "reimburse" members of the TAC for performing their duties related to validation.[56] Given this bright statutory line between those who *develop* tests and those who *advise* the Commissioner on validity, the Commissioner's reliance on the TAC's advice was not ultra vires.

## III. The Declaratory Judgment Claims

In addition to their ultra vires claims, the Plaintiff districts allege immunity was waived under the Uniform Declaratory Judgment Act (UDJA) to seek a

---

[52]     *See, e.g., Tex. Tech Univ. Sys. v. Martinez*, 691 S.W.3d 415, 422 (Tex. 2024).

[53]     *See Independent Agency*, BLACK'S LAW DICTIONARY 77 (12th ed. 2024).

[54]     § 39.038.

[55]     § 39.039(b), (c).

[56]     § 39.02302(a), (c).

declaration of "rights, status, and other legal relations."[57] But the UDJA "does not contain a general waiver of sovereign immunity"; it provides "only a limited waiver for challenges to the *validity* of an ordinance or statute."[58] Plaintiffs do not challenge the validity of Chapter 39, just that the Commissioner failed to comply with it. A claim alleging that an official is "improperly applying the law" must be brought as ultra vires claim, not under the UDJA.[59] Accordingly, it is insufficient to waive immunity.

## Conclusion

Neither pleadings nor evidence support the Districts' claims that issuing ratings, standards, or explanatory materials after the applicable statutory deadlines would be an ultra vires act beyond the Commissioner's legal authority. The trial court thus erred by denying his plea to the jurisdiction. And because a court lacking jurisdiction cannot award injunctive relief, not "even temporarily,"[60] the trial court erred by granting the Districts' temporary injunction. Accordingly, we vacate both orders, dissolve the temporary injunction and the Third Court's Rule 29.3 stay order, and render judgment dismissing this suit for want of jurisdiction.

/s/ Scott Brister

Scott Brister
Chief Justice

Before Chief Justice Brister and Justices Field and Farris.

---

[57]    TEX. CIV. PRAC. & REM. CODE § 37.002(b).

[58]    *State v. Zurawski*, 690 S.W.3d 644, 660 (Tex. 2024) (emphasis added).

[59]    *Id.* at 660–61 & n.33.

[60]    *In re Abbott*, 601 S.W.3d 802, 805 (Tex. 2020) (orig. proceeding).