# IN THE SUPREME COURT OF TEXAS

═════════════

No. 16-0773

═════════════

WALLACE L. HALL, JR., IN HIS OFFICIAL CAPACITY AS A REGENT FOR THE
UNIVERSITY OF TEXAS SYSTEM, PETITIONER,

v.

WILLIAM H. MCRAVEN, IN HIS OFFICIAL CAPACITY AS CHANCELLOR FOR THE
UNIVERSITY OF TEXAS SYSTEM, RESPONDENT

═══════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════════════════════════════

JUSTICE GUZMAN, concurring.

Contrary to a well-known aphorism, silence is not always golden.[1]  Silence has a cost.

Silence allows for injustice, stunts growth, and thwarts change.  The case before us today submits

further proof that enlightenment comes from questions, even more than answers.[2]

Following Regent Wallace L. Hall Jr.'s inquiries about the University of Texas's admission

---

[1] *See Ecclesiastes* 3:17 (King James) ("To everything there is a season . . . a time to keep silence, and a time to speak.").

[2] *See Matthew* 7:7 (King James) ("Ask, and it shall be given you; seek, and ye shall find; knock, and it shall be opened unto you."); WISDOM FOR THE SOUL: FIVE MILLENNIA OF PRESCRIPTIONS FOR SPIRITUAL HEALING 583 (Larry Chang ed., 2006) ("It is not the answer that enlightens, but the question." (quoting EUGÈNE IONESCO, DECOUVERTES (1969))); CLAUDE LEVI-STRAUSS, LE CRU ET LE CUIT [The Raw and the Cooked] 15 (1964), https://monoskop.org/images/3/3a/Levi-Strauss_Claude_Mythologies_1_Le_cru_et_le_cuit.pdf ("Le savant n'est pas l'homme qui fournit de vraies réponses; c'est celui qui pose les vraies questions.") ("The wise man doesn't give the right answers, he poses the right questions." (Eng. trans.)).

practices, then-Chancellor Francisco Cigarroa initiated an internal investigation that uncovered concerns about external influences on admission decisions at UT. Further inquiry and disclosures prompted the University to commission an independent external audit of admission practices. In pursuing the matter further, UT's governing body, the UT System Board of Regents,[3] expressed the conviction that "the integrity of the admissions process at a public university depends upon the unbiased determination of the appropriate merits of each applicant; that attempts to unduly influence the process are inappropriate; and that a student should not be advantaged or given special consideration as a result of . . . connections or financial resources."[4]

After an extensive six-month investigation involving several hundred thousand pages of documents, the independent auditor, Kroll Associates, reported its findings to the University shortly after Admiral William H. McRaven's succession as Chancellor of the UT System. According to the publicly released Kroll Report, a pattern and practice of considering applicants outside the regular admission process existed at UT, causing "increasing levels of tension" between the Admissions Office and the University President's office, but resulting in only a "handful" of applicants being admitted over the Admissions Office's objection each year.[5] Though an increasing number of applicants had been considered for admission in this manner, Kroll found that a relatively small

---

[3] *See* TEX. EDUC. CODE §§ 51.352, 65.11, 65.31, 67.02.

[4] KROLL ASSOCIATES, FINAL REPORT TO THE OFFICE OF THE CHANCELLOR OF THE UNIVERSITY OF TEXAS SYSTEM, at 11 (February 6, 2015) (Kroll Report); *see also* Kroll Report, App. A, Ex. A (outlining the "scope of work").

[5] *Id.* at 13.

number of "arguably less-qualified applicants" actually benefitted from the practice.[6]

While no evidence existed that spots had been "save[d]" for certain applicants or that any applicant had been admitted based on a *quid pro quo* or other inappropriate promise or exchange, Kroll determined it was "readily apparent that certain applicants are admitted at the instigation of the President over the assessment of the Admissions Office," for a variety of reasons.[7] This aspect of UT's admission processes had not been publicly disclosed, however.[8] Nor had undisclosed admission practices been divulged during the internal investigation, which Kroll characterized as constituting "material omissions [that] misled the [internal] inquiry." In that regard, the report concluded that key UT officials failed "to speak with the candor and forthrightness expected of people in their respective positions of trust and leadership."[9]

The Kroll Report concludes that, while disconcerting, the admission practices did not violate any existing law, rule, or policy. Nevertheless, issues of fairness and transparency were implicated and guidance for University officials was merited.[10] Considering a variety of sources for best practices, Kroll outlined recommended policies and procedures for avoiding undue influence in university admissions, if the Chancellor and Board of Regents determined that such reforms were

---

[6] "The total number of arguably less-qualified applicants who have benefitted from the hold system and the [UT] President's oversight of the hold candidates appears to be relatively small. Indeed, from 2009 to 2014 Kroll identified a total of only 73 enrolled applicants who were admitted with both a combined SAT score of less than 1100 and a high school GPA of less than 2.9." *Id*.

[7] *Id*. at 13-14.

[8] *Id*. at 14.

[9] *Id*.

[10] *Id*. at 14, 36.

3

necessary.[11]

In response to the Kroll Report, Chancellor McRaven convened a Blue Ribbon panel of former chancellors and University presidents to review UT's admission processes in light of the Kroll Report's findings and recommendations. The panel made recommendations for strengthening the admission process at UT. Thus, prompted by Regent Hall's inquiries, deficiencies that threatened to undermine the integrity of the admission process were exposed and addressed.

The upshot is that inquiries can and do spur positive change when those with the power to act are willing to engage in critical self-examination, as UT's Chancellor and Board of Regents did in this case. But does that mean there are no more inquiries to be made? Not in Regent Hall's view. And not from the perspective of the two other regents who supported his motion to review the documents provided to Kroll Associates.[12] All have expressed concern that regents must have the information they need to fulfill their duties and responsibilities to the UT System, including "the legal responsibilities of a fiduciary in the management of funds under the control of institutions subject to the board's control and management."[13] All have questioned whether regents—guardians of the University's welfare and reputation—can make informed decisions if they do not have access to the underlying data and documents on which recommended policies and procedures are based.

---

[11] *Id.* at 93.

[12] Regents Alex M. Cranberg and Brenda Pejovich along with two former board members filed an amicus brief supporting Hall's request for unrestricted access to the materials provided to Kroll Associates. These current and former regents "emphasize that a regent should not have completely unfettered access to data and documents containing personally identifiable student information," but explain that the starting point of the analysis must be a presumption of openness rather than a presumption of confidentiality.

[13] TEX. EDUC. CODE § 51.352.

4

Context is often vitally important, and as the Court observes here, "facts are the greatest ally" in the quest for change.[14] I fully agree.

Yet, the record before the Court reflects that Regent Hall has not been denied access to the documents Kroll Associates reviewed. Rather, he was offered—and has accepted—access to the Kroll documents with certain student information redacted, information that is, at least in some respects, confidential under the Family Educational Rights and Privacy Act (FERPA).[15] He has also been offered—but declined—a process by which to obtain all the information he seeks, a process that ostensibly balances privacy interests against an assurance of legitimate need. The process reflects the governing body's judgment that an individual regent's interest in a particular matter can overcome competing privacy rights of students, but not necessarily or automatically.

The Board-adopted two-step process may have afforded Regent Hall access to all the information necessary to fulfill his obligations as a regent without the necessity of judicial intervention. But must a University official imbued with broad oversight authority for the UT System—one who is charged with setting admission standards and subject to criminal sanctions if confidential information is misused—prove his mettle before obtaining the same degree of access the Board has allowed to third parties, like Kroll Associates, and myriad UT personnel engaged in the redaction process?[16] Should a regent's right of access to confidential information be presumed

---

[14] *Ante* at ___.

[15] 20 U.S.C. § 1232g.

[16] *See* Tex. Att'y Gen. Op. No. KP–0021 (2015) (opining that the Board of Regents "may not prohibit an individual regent from obtaining access to records in the possession of the University that are necessary to fulfill his duties as a regent"); *see also ante* at ___ (WILLETT, J., concurring) (citing the Attorney General's decision with approval).

5

or need it be established when compelling privacy interests are at stake?[17]

Redressing grievances when rights and duties collide is the bread and butter of the judicial system, but our ability to decide the merits of this dispute is constrained by the limits of our jurisdiction. And this is no trifling matter.[18] So, while the separate writings issued today may touch on the merits, the Court cannot, because disposition of this appeal ultimately turns on whether Hall asserts a valid *ultra vires* action against Chancellor McRaven. As the court of appeals held, and as this Court unanimously affirms, the answer to that threshold matter precludes further inquiry into the merits of the parties' arguments.

The Court faithfully applies *ultra vires* principles and our precedent in holding that Chancellor McRaven, a dedicated public servant committed to honoring the chain of command, was obliged to follow the Board of Regents' directives and therefore did not act *ultra vires*.[19] I therefore fully join the Court's opinion and judgment. I write separately primarily to underscore that the issues raised and the applicable legal standards restrict the Court's ability to reach the merits of the underlying dispute.

The circumstances of this case also compel me to highlight the importance of judicious

---

[17] "Who will guard the guardians?" JUVENAL, SATIRE VI 6.346-48, http://www.thelatinlibrary.com/juvenal/6.shtml ("sed quis custodiet ipsos custodes").

[18] *See, e.g.*, *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016) (observing sovereign and governmental immunity implicate subject-matter jurisdiction) (citing *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012)); *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014) (citing constitutional advisory-opinion restrictions in deciding not to consider an issue when the Court's disposition of another issue resolved the parties' dispute); *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions.").

[19] *Ante* at ___.

inquiry, especially considering that the caretakers of the University of Texas—an educational institute "of the first class"[20]—are charged with cultivating scholars and future leaders. Although members of a group must work within rules that provide essential order, the events precipitating the underlying dispute confirm the benefits of being open to inquiry and examination. History, replete with examples of great debacles that might have been avoided had someone spoken up, validates the principle that "[i]t is error only, and not truth, that shrinks from inquiry."[21]

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: January 27, 2017

---

[20] TEX. CONST., art. VII, § 10.

[21] THOMAS PAINE, *Letter Addressed to the Addressers on the Late Proclamation*, *in* LIFE AND WRITINGS OF THOMAS PAINE 186, 209 (Daniel Edwin Wheeler ed., 1908), https://archive.org/stream/lifewritingsofth05pain#page/n0/mode/2up.