**PREMIER LEARNING ACADEMY, INC., Appellant**

v.

**TEXAS EDUCATION AGENCY; Mike Morath, in his Official Capacity as the Texas Commissioner of Education; and John Sawyer, in his Official Capacity as Conservator for Premier Learning Academy Inc., Appellees**

NO. 03-17-00064-CV

Court of Appeals of Texas, Austin.

Filed: June 8, 2017

Mr. Russ Lambert Lambert, Law Group PLLC, Dallas, TX, for Premier Learning Academy.

Mr. Eric A. Hudson, Assistant Attorney General, Austin, TX, for Texas Education Agency and Texas Commissioner of Education.

Before Chief Justice Rose, Justices Field and Bourland

## OPINION

Scott K. Field, Justice

After appellant Premier Learning Academy, Inc. (Premier [1]) received unacceptable academic performance ratings for three consecutive school years, the Texas Education Agency (TEA) informed Premier that it would not renew Premier's char-

---

1. For convenience, we will use "Premier" to refer both to the charter holder and to the school it operated.

ter and appointed conservators. When Premier tried to pay off several debts using state funds, a conservator refused to allow payment. Premier sued the TEA and its commissioner, Mike Morath, in his official capacity.[2] The TEA and Commissioner Morath filed a plea to the jurisdiction, which the trial court granted. In four appellate issues, Premier contends that the trial court erred in granting the plea and dismissing Premier's claims. We will affirm the trial court's order granting the plea to the jurisdiction.

## BACKGROUND

The following facts are undisputed. In 2011, the TEA issued Premier a charter to operate an open-enrollment charter school in La Marque, Texas. *See* Tex. Educ. Code § 12.101(a) (providing that TEA commissioner "may grant a charter on the application of an eligible entity for an open-enrollment charter school"). As a charter school, Premier received Foundation School Program (FSP) funds from the State. *See id.* § 12.106. FSP funds are "public funds" and "are held in trust by the charter holder for the benefit of the students of the open-enrollment charter school." *Id.* § 12.107(a)(1), (2).

Premier received unacceptable academic performance ratings for the 2012–2013, 2013–2014, and 2014–2015 school years. In November 2015, the TEA notified Premier that it was revoking Premier's charter and that it would not renew Premier's charter when it expired on July 31, 2016. The TEA also appointed a management team composed of three conservators, one of whom

was John Sawyer. Sawyer directed Premier to "make final payments to all creditors" by August 1, 2016. He also directed Premier to "transfer all remaining FSP funds" to the TEA by September 15, 2016.

On July 12, 2016, Premier's board of trustees met and approved the use of remaining FSP funds to pay off the following debts:

- $34,710.47 owed under a multi-year utility contract for power;
- $500,000 owed under a multi-year campus lease; and
- $90,000 owed as a severance package for the superintendent under a multi-year employment contract.

It is undisputed that Premier accrued these debts while operating a charter school. It is also undisputed that Premier lawfully received the FSP funds that it wished to use to pay these debts. Sawyer, as a TEA-appointed conservator, denied approval of the board's proposals.

On September 6, 2016, Premier sued the TEA and Commissioner Morath. In its original petition, Premier sought declarations under the Uniform Declaratory Judgments Act that Premier may use its remaining FSP funds to meet its contractual obligations and that the TEA does not have the authority to "take possession" of or "assume control" of Premier's bank account that holds the FSP funds. Premier also asserted ultra vires claims against Commissioner Morath and sought a temporary restraining order and a temporary and permanent injunction prohibiting the defendants from taking control of, or re-

---

**2.** Premier's original petition also named John Sawyer, a TEA-appointed conservator, as a defendant. However, nothing in the record before us indicates that Sawyer was ever made a party to, or participated in, the trial-court proceedings. Sawyer was not a party to the plea to the jurisdiction, and the trial court's order granting the plea does not dis-

pose of any claims against Sawyer. Therefore, we dismiss Premier's appeal as to Sawyer. Moreover, we will consider the trial court's order granting the plea to the jurisdiction of the TEA and Commissioner Morath to be a final and appealable judgment disposing of all parties and claims.

stricting Premier's access to, its bank accounts. Premier attached to its petition an affidavit of Richard Sickmiller, Premier's "Board President."

The TEA and Commissioner Morath filed a plea to the jurisdiction arguing that Premier lacked standing to raise its claims and that sovereign immunity barred Premier's claims. The trial court granted the plea to the jurisdiction without explaining its decision. This appeal followed.

## STANDARD OF REVIEW

■ "Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex. 2004); *see Engelman Irrigation Dist. v. Shields Bros., Inc.,* 514 S.W.3d 746, 751 (Tex. 2017) ("In *Houston Belt* and *Miranda,* we held that sovereign immunity concerns jurisdiction and therefore 'is properly asserted in a plea to the jurisdiction.'"). "Where, as here, evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary-judgment standard." *Harris Cty. Flood Control Dist. v. Kerr,* 499 S.W.3d 793, 798 (Tex. 2016) (citing *Miranda,* 133 S.W.3d at 227–28). "Appellate courts reviewing a challenge to a trial court's subject matter jurisdiction review the trial court's ruling *de novo.*" *Miranda,* 133 S.W.3d at 228.

This case requires us to interpret the Texas Education Code. We review questions of statutory construction de novo. *See First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 631 (Tex. 2008). When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *See id.* at 631–32; *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs,* No. 03-15-00262-CV, —— S.W.3d ——, ——, 2017 WL 672455, at *4 (Tex. App.—Austin Feb. 17, 2017, no pet.). In determining legislative intent, we begin with the statute's words. *See TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011). Where the statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would lead to absurd results. *See Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex. 2009); *see also BankDirect Capital Finance, LLC v. Plasma Fab, LLC,* No. 15-0635, 519 S.W.3d 76, 78, 2017 WL 1968024, at *1 (Tex. May 12, 2017) ("If a case can be decided according to the statute itself, it must be decided according to the statute itself. This is a bedrock principle.").

## DISCUSSION

■ We begin by noting that Premier's appellate brief argues only that the trial court erred in granting the plea to the jurisdiction as to Premier's ultra vires claims. To the extent Premier's original petition asserted additional claims, Premier has now waived those claims by inadequately briefing them. *See* Tex. R. App. P. 38.1(i). Moreover, the TEA is not a proper party to ultra vires claims. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 373 (Tex. 2009) ("[I]t follows that these [ultra vires] suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity."); *EMCF Partners, LLC v. Travis Cty.,* No. 03-15-00820-CV, 2017 WL 672457, at *6 (Tex. App.—Austin Feb. 15, 2017, no pet.) (mem. op.) ("Suits alleging ultra vires acts cannot be brought against the state or its political subdivisions, which retain immunity, but must be brought against the state actors in their

official capacity."). Accordingly, we must affirm the trial court's order as to the TEA.

■ The only question properly before us is whether the trial court erred in granting Commissioner Morath's plea to the jurisdiction as to Premier's ultra vires claims.[3] Governmental immunity does not bar claims alleging that a government officer acted ultra vires, or without legal authority, in carrying out his duties. *See Houston Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154, 161 (Tex. 2016) ("[W]hile governmental immunity provides broad protection to the state and its officers, it does not bar a suit against a government officer for acting outside his authority—*i.e.*, an *ultra vires* suit."); *Heinrich*, 284 S.W.3d at 372 ("[I]t is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money."); *EMCF Partners*, 2017 WL 672457, at *6. "'To fall within this *ultra vires* exception,' however, 'a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Houston Belt*, 487 S.W.3d at 161 (quoting *Heinrich*, 284 S.W.3d at 372).

■ Premier first alleges that Commissioner Morath acted ultra vires by refusing to allow Premier "to pay its Superintendent $90,000 constituting one-year's salary due and owing after revocation of [Premier's] Charter." Premier asserts that this action violated Texas Education Code section 11.201(c), which provides the following:

> For purposes of this subsection, "severance payment" means any amount paid by the board of trustees of an independent school district to or in behalf of a superintendent on early termination of the superintendent's contract that exceeds the amount earned by the superintendent under the contract as of the date of termination, including any amount that exceeds the amount of earned standard salary and benefits that is paid as a condition of early termination of the contract. The board of trustees that makes a severance payment to a superintendent shall report the terms of the severance payment to the commissioner. The commissioner shall reduce the district's Foundation School Program funds by any amount that the amount of the severance payment to the superintendent exceeds an amount equal to one year's salary and benefits under the superintendent's terminated contract. The commissioner may adopt rules as necessary to administer this subsection.

Tex. Educ. Code § 11.201(c). Premier argues, "[Sickmiller's affidavit] proves that the Board budgeted and approved payment of one-year's post-revocation salary to [Premier's] Superintendent and that it was a necessary and proper expense. The statute *only* permits recovery for amounts beyond the one-year severance amount."

We disagree with Premier's interpretation of this statute. Section 11.201(c) imposes a mandatory duty on the TEA com-

---

3. We note that Commissioner Morath argues on appeal that we may automatically affirm the trial court's order because Premier has failed to respond on appeal to a point raised in the plea to the jurisdiction—namely, that Premier has essentially brought an impermis- sible suit for money damages disguised as an ultra vires claim. We will assume, without deciding, that Premier did not waive this is- sue because it did respond to Commissioner Morath's assertion that immunity bars Premi- er's claims.

missioner in a particular situation—when the severance payment to a superintendent exceeds one year's salary and benefits, the commissioner must reduce the school's FSP funds by the excess amount. But section 11.201(c) does not command that the commissioner must always allow a charter school to use its FSP funds to pay a superintendent's severance package. Therefore, we turn to other statutory provisions to determine the commissioner's authority over FSP funds in general.

The Education Code directs the TEA commissioner to "take such action and require such reports consistent with this chapter as may be necessary to implement and administer" the FSP. *See id.* § 42.004. The Education Code also makes it clear that FSP funds "are considered to be public funds for all purposes under state law." *Id.* § 12.107(a)(1). Such funds "are held in trust by the charter holder for the benefit of the students of the open-enrollment charter school" and "may be used only for a purpose for which a school may use local funds." *Id.* § 12.107(a)(2), (3). Similarly, "[p]roperty purchased or leased" with FSP funds "is considered to be public property for all purposes under state law," "is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school," and " may be used only for a purpose for which a school district may use school district property." *Id.* § 12.128(a)(1)–(3).

The Education Code gives the TEA commissioner broad authority over FSP funds and the public property purchased or leased with those funds. For example, the Education Code provides that the commissioner must assume control of public property held by a charter school that ceases to operate:

The commissioner shall:

(1) take possession and assume control of the property described by Subsection (a) of an open-enrollment charter school that ceases to operate; and

(2) supervise the disposition of the property in accordance with law.

*Id.* § 12.128(c). When, as here, a school fails to satisfy the Education Code's academic performance standards, the commissioner may appoint a conservator or management team. *Id.* § 39.102(a)(7), (8). This conservator or management team is "to oversee the operations of the district." *Id.* § 39.111(a). Specifically, the conservator or management team "may direct an action to be taken by the principal of a campus, the superintendent of the district, or the board of trustees of the district" and "may approve or disapprove any action of the principal of a campus, the superintendent of the district, or the board of trustees of the district." *Id.* § 39.111(c)(1), (2). Finally, "[i]f the commissioner revokes or denies the renewal of a charter of an open-enrollment charter school or an open-enrollment charter school surrenders its charter, the school may not … continue to operate under this subchapter" or "receive state funds under this subchapter." *Id.* § 12.1161(a)(1), (2).

These provisions grant the TEA commissioner broad authority over the FSP, provide that FSP funds and the property purchased or leased with those funds are public property, direct the commissioner to take control of all of an open-enrollment charter school's public property if the school ceases to operate under a charter, and give a conservator or management team vast powers to direct, approve, and disapprove of actions taken by school officials. Therefore, even taking Premier's pleadings as true and indulging every reasonable inference and resolving any doubts in Premier's favor, we conclude that Premier has not raised a fact question as to

whether Commissioner Morath exceeded his statutory authority by refusing to allow Premier to use its remaining FSP funds to pay its superintendent's severance package. When Premier's charter expired on July 31, 2016, the commissioner acquired almost plenary power over the FSP funds, which are public property being held by Premier for educational purposes.[4]

Nevertheless, Premier argues that the Education Code specifically prohibits the commissioner's actions here. Premier notes that the statute provides that a conservator or management team "may not adopt a budget for the district that provides for spending a different amount, exclusive of required debt service, from that previously adopted by the board of trustees." *Id.* § 39.111(c)(6). According to Premier, when Sawyer, acting as a conservator on behalf of Commissioner Morath, refused to approve the board's proposal to pay the severance package with FSP funds, he was effectively rewriting Premier's budget. We disagree.

We conclude that section 39.111(c)(6) refers to a situation in which a school is still operating under a charter and the conservator or management team is overseeing the school's operations. Once a charter expires and the school is no longer operating, however, the school no longer has a "budget." Indeed, without a charter, the school "may not ... continue to operate." *Id.* § 12.1161(a)(1). Without operations, the school has no "budget," and all of the public property it holds immediately falls under the control of the commissioner. If

section 39.111(c)(6) prohibited the commissioner or his appointed representatives from disrupting the school's business as usual, it would be inconsistent with the provisions cited above that give the commissioner almost absolute authority over the FSP funds held by a school whose charter has been revoked or has expired.

Premier also alleges that Commissioner Morath acted ultra vires by refusing "to pay bills incurred for the education of [Premier's] students lawfully and properly budgeted and approved by [Premier's] Board." These bills included a utility bill and a bill connected with Premier's campus lease. According to Premier, Commissioner Morath's actions violated Texas Education Code section 12.1061, which provides the following:

> The commissioner may not garnish or otherwise recover funds paid to an open-enrollment charter school under Section 12.106 if:
>
> (1) the basis of the garnishment or recovery is that:
>
> (A) the number of students enrolled in the school during a school year exceeded the student enrollment described by the school's charter during that period; and
>
> (B) the school received funding under Section 12.106 based on the school's actual student enrollment;
>
> (2) the school:
>
> (A) submits to the commissioner a timely request to revise the maximum student enrollment described

---

4. Our interpretation is bolstered by the fact that the legislature repealed section 12.1161(b), which previously read, "An open-enrollment charter school may continue to operate and receive state funds under this subchapter for the remainder of a school year if the commissioner denies renewal of the school's charter before the completion of that school year." Act of May 28, 2001, 77th Leg., R.S., ch. 1504, § 13, sec. 12.1161(b), 2001 Tex. Gen. Laws 5344, 5351, *repealed by* Act of May 26, 2013, 83d Leg., R.S., ch. 1140, § 47(3), 2013 Tex. Gen. Laws 2760, 2777. The legislature's decision to repeal this provision suggests that the legislature is not necessarily in favor of allowing a school to wind down its own affairs.

by the school's charter and the commissioner does not notify the school in writing of an objection to the proposed revision before the 90th day after the date on which the commissioner received the request, provided that the number of students enrolled at the school does not exceed the enrollment described by the school's request; or

(B) exceeds the maximum student enrollment described by the school's charter only because a court mandated that a specific child enroll in that school; and

(3) the school used all funds received under Section 12.106 to provide education services to students.

*Id.* § 12.1061. We conclude that this provision is not relevant here, because subsections (1), (2), and (3) are all in the conjunctive—they must all be satisfied to trigger the restriction that "[t]he commissioner may not garnish or otherwise recover funds paid to an open-enrollment charter school under Section 12.106." Here, subsection (1) is not satisfied, because "the basis of the garnishment or recovery" has nothing to do with the number of students enrolled. Because Commissioner Morath did not act on the basis described in subsection (1), section 12.1061 does not prohibit him from refusing to allow Premier to use FSP funds to pay its debts.

Premier also cites the Texas Property Code to argue that, as trustee of the FSP funds, it has "the discretion to wind down a trust which includes making payments to creditors." *See* Tex. Prop. Code § 112.052 ("If an event of termination occurs, the trustee may continue to exercise the powers of the trustee for the reasonable period of time required to wind up the affairs of the trust and to make distribution of its assets to the appropriate beneficiaries."). Premier's reliance on the Property Code is

misplaced. Although the Education Code provides that FSP funds "are held in trust by the charter holder for the benefit of the students of the open-enrollment charter school," *see* Tex. Educ. Code § 12.107(a)(2), we do not read the Education Code to implicitly incorporate the entirety of trust law, especially if that law were to contradict the Education Code's explicit provisions. It is the Education Code, not the Property Code, that governs open-enrollment charter schools and designates FSP funds as public property over which the commissioner may exercise broad authority when a school no longer operates under a charter.

In addition to the statutory arguments described above, Premier asserts that interpreting the Education Code to allow the TEA commissioner to take control of the school's FSP funds would have the result "that no credible Superintendent, no utility, no commercial real estate owner, would be willing to do business with Texas charter schools fearing revocation of the charter leaving the vendors, employees, and owners with huge unpaid debts and/or court costs and costs of litigation to pursue recovery." However, such argument should be directed to the Texas Legislature, not the courts. As the Texas Supreme Court has recently reminded us,

Separation of powers demands that judge-interpreters be sticklers. Sticklers about not rewriting statutes under the guise of interpreting them. Sticklers about not supplanting our wisdom for that of the Legislature. Sticklers about a constitutional design that confers the power to adjudicate but not to legislate.

*BankDirect*, 519 S.W.3d at 86, 2017 WL 1968024, at *7 (footnote omitted). Furthermore, charter holders who accept state funds agree to subject themselves to increased regulation and accountability. *See* Tex. Educ. Code § 12.1071.

In summary, we conclude, as a matter of law, that the Education Code grants Commissioner Morath the authority to refuse to allow Premier to use FSP funds to pay its debts. Therefore, even accepting Premier's allegations as true, Premier has not raised a fact question as to whether Commissioner Morath exceeded his authority. Moreover, because Premier's pleadings conclusively establish that Commissioner Morath did not act ultra vires, the trial court was not required to allow Premier an opportunity to amend its petition. *See Miranda*, 133 S.W.3d at 227 ("If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend."). Accordingly, we overrule Premier's appellate issues.[5]

## CONCLUSION

We affirm the trial court's order granting the plea to the jurisdiction of the TEA and Commissioner Morath.

---

5. In his plea to the jurisdiction, Commissioner Morath also asserted that Premier lacks standing to bring its claims. Given our analysis above, we need not address that issue. We also need not address Commissioner Morath's argument that Premier has essentially brought an impermissible suit for money damages disguised as an ultra vires claim. *See* Tex. R. App. P. 47.1.