# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0588

═══════════

ERIC D. HILLMAN, PETITIONER,

v.

NUECES COUNTY, TEXAS AND NUECES COUNTY DISTRICT ATTORNEY'S OFFICE,
RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════

JUSTICE GUZMAN, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, concurring.

*No tyranny is more cruel than the one practiced
in the shadow of the laws and under color of justice.*[1]

Imagine being accused, charged, and convicted of bludgeoning your spouse to death. You are innocent but sentenced to life in prison, effectively orphaning your only child. Over the next 24 years, you wage an uphill battle to prove your innocence, eventually discovering that the prosecution held the keys to your jail cell before you ever set foot in it. Eye-witness testimony pointing the finger at someone else and DNA evidence that was never tested would have exculpated you if the prosecutor had not secreted the evidence from those who were constitutionally charged with

[1] Charles de Secondat, Baron de Montesquieu, *Considerations on the Causes of the Greatness of the Romans and Their Decline* 130 (David Lowenthal trans., Hackett Pub. Co., 1999) (1965).

defending you. Ultimately exonerated after nearly a quarter century in confinement, you walk free. The prosecutor—now a judge—is found in contempt of court for suppressing this evidence. Small comfort. Justice delayed is justice denied. But more than that, justice delayed is life denied.

While you were locked away for a crime you did not commit, you were denied your unalienable rights of life, liberty, and the pursuit of happiness. You lost your constitutional right to parent your child. To have his love and companionship. To shape who he is and how he became that way. Instead, your beautiful toddler is now a man struggling to reconnect with a person he doesn't know, can't remember as a parent, and spent years thinking was a vicious monster. And worse, the actual perpetrator of this heinous crime continued to walk the streets. Free to kill again.

Alas, this is not a hypothetical. This is the true story of Michael Morton.[2] Husband. Father. Supermarket manager. An ordinary Texan whose young wife fell victim to a stranger's brutality. And while Morton languished in jail, another young wife—Debra Baker—paid the ultimate price at the hands of the same killer, leaving yet another young child motherless. Foreseeable victims of overzealous prosecution.

Unfortunately, this is not an isolated incident. Official misconduct has been a factor in more than half of the nationally reported exonerations since 1989—nearly four score of which have

---

[2] *See Michael Morton*, INNOCENCE PROJECT, https://www.innocenceproject.org/cases/michael-morton/ (last visited Mar. 1, 2019); *see also* Brandi Grissom, *Morton Talks About Ordeal, Life After Prison*, TEXAS TRIBUNE (Mar. 27, 2012), https://www.texastribune.org/2012/03/27/michael-morton-talks-about-ordeal-plans-future; Claire Osborn, *How Ken Anderson was Released After Only Five Days in Jail*, STATESMAN (Sept. 26, 2018), https://www.statesman.com/NEWS/20131116/How-Ken-Anderson-was-released-after-only-five-days-in-jail.

occurred in Texas.[3] Wrongful convictions are anathema to our constitution. And suppression of evidence is anathema to the duty of a prosecutor to seek justice. Concealment of exculpatory evidence undermines the integrity of our criminal justice system, which is of vital importance to every one of us: "Society wins not only when the guilty are convicted but when criminal trials are fair . . . the administration of justice suffers when any accused is treated unfairly."[4]

The tragic story of Michael Morton and Debra Baker compelled the Legislature to take affirmative steps to prevent wrongful convictions due to prosecutorial misconduct. In the legislative session following Morton's exoneration, the Texas Legislature unanimously passed the Michael Morton Act.[5] The Morton Act extends, but has not altered, prosecutors' longstanding obligation under *Brady v. Maryland*[6] to disclose exculpatory evidence in the prosecution's possession. Before the Morton Act, prosecutors had a constitutional duty under *Brady* to disclose all evidence that might exonerate the defendant, but the defense had very limited pretrial discovery rights.[7] Under the Morton Act, if the defense requests discovery, the prosecution is under a statutory

---

[3] *See Exoneration Detail List*, NATIONAL REGISTRY OF EXONERATIONS, http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx?FilterClear=1&View={faf6eddb-5a68-4f8f-8a52-2c61f5bf9ea7}&SortField=OM&SortDir=Asc&FilterField1=OM&FilterValue1=8_OM&FilterField2=ST&FilterValue2=TX (last visited Mar. 1, 2019).

[4] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[5] *See* Michael Morton Act, 83d Leg., R.S., ch. 49, 2013 Tex. Gen. Laws 106 (amended 2017) (current version at TEX. CRIM. PROC. CODE art. 39.14); *see also* Brandi Grissom, *Michael Morton Act Handily Passes Senate*, TEXAS TRIBUNE (Apr. 11, 2013), https://www.texastribune.org/2013/04/11/senate-approves-michael-morton-act/.

[6] 373 U.S. 83 (1963).

[7] *Hackathorn v. State*, 422 S.W.2d 920, 922 (Tex. Crim. App. 1964) ("It has been the consistent holding of this Court that counsel for the state is not required to furnish the accused with statements of witnesses, copies of reports, or his written statements, for the purpose of pre-trial inspection.").

duty to continually disclose exculpatory, mitigating, or impeachment evidence.[8]  The Act is an important legislative step towards ensuring *Brady* compliance and bolstering the integrity of the criminal justice system.

As this case sadly demonstrates, however, unacceptable gaps remain.  When one good man refuses to stay silent, refuses to "just follow orders," and refuses to do the wrong thing under the misguided belief that it's for the greater good, he should not lose his job.  While Hillman might have had a viable *ultra vires* claim, had he chosen to pursue one, the limited remedies available under that theory are manifestly inadequate to ensure accountability in matters of the highest constitutional dimension.  The law must—but currently does not—afford a remedy that advances the Legislature's calculated efforts to secure our constitutional guarantees.

# I

*Injustice anywhere is a threat to justice everywhere.*[9]

In 2013, Eric Hillman, an assistant district attorney in Nueces County, was assigned to prosecute David Sims for intoxication assault and leaving the scene of an accident.[10]  Hillman performed a diligent independent investigation and located a witness who was not listed in the police

---

[8] TEX. CRIM. PROC. CODE § 39.14(a), (h), (k).

[9] Martin Luther King, Jr., *Letter from Birmingham Jail* (Apr. 16, 1963).

[10] The facts recounted are based on Hillman's pleadings, which we construe liberally in his favor.  *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

report.  The witness told Hillman she was with Sims the entire evening, he had only consumed two alcoholic beverages, and he was not intoxicated when the accident occurred.[11]

Hillman immediately informed his supervisor that a new witness with exculpatory testimony had been located and he would be releasing that information to Sims's defense counsel.  The supervisor demanded Hillman withhold the information, assuring him it was proper to do so.

Unconvinced, Hillman conducted an independent investigation of his ethical obligations, consulting with both the Texas Center for Legal Ethics and the State Bar of Texas Ethics Hotline.  Both admonished him to disclose the information to defense counsel.  Hillman therefore reported to his supervisor that he intended to turn over the evidence to the defense because withholding it would be unethical.  According to Hillman, his supervisor responded, "Eric, you need to decide if you want to be a prosecutor or a defense attorney."  A week after Hillman announced his intention to disclose the information, former District Attorney Mark Skurka summarily terminated Hillman's employment for refusing to "follow instructions."

Hillman sued the County, District Attorney Skurka, and the District Attorney's Office (collectively, the County) for wrongful termination, but his case was dismissed on a plea to the jurisdiction.  Today the Court affirms, holding that (1) neither the common law nor the Morton Act permit Hillman to sue his governmental employer for damages and (2) Hillman has expressly waived an *ultra vires* claim.

---

[11] The identity of the witness and her relationship to the incident is not stated in the pleadings.  The Innocence Project's amicus brief states, and the parties do not dispute, that the witness was a parent who chaperoned a group of girls, including the victim, on the night of the incident when they first became acquainted with Sims and his group.

5

I concur in today's judgment and join in much of the Court's reasoning. The gravamen of this case is governmental immunity: whether the County is immune from a wrongful-termination suit alleging a prosecutor was fired because he insisted on doing what the law requires. Under our immunity jurisprudence, this case is fairly straightforward, and the Court's analysis is sound. First, we did not abrogate governmental immunity in *Sabine Pilot*.[12] The employer in that case was not a governmental entity, so the issue of governmental immunity was not before us and cannot be inferred *sub silentio*.[13] Second, immunity has not been waived. We defer to the Legislature to waive immunity,[14] and I agree with the Court that the Morton Act contains no such waiver because no "clear and unambiguous language" expresses that intent.[15] Third, we should not abrogate immunity here. Although we have the power to abrogate immunity,[16] we have rarely done so, and even then we limited it to offset claims rather than allowing unlimited recovery of monetary damages.[17] Sanctioning the recovery of monetary damages—without any legislatively considered limitations

---

[12] 687 S.W.2d 733 (Tex. 1985).

[13] *See id.* at 734.

[14] *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002) ("[T]he Legislature is better suited than the courts to weigh the conflicting public policies associated with waiving immunity . . . ."); *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997) ("[T]his Court has uniformly held that it is the Legislature's sole province to waive or abrogate sovereign immunity.").

[15] *Tooke v. City of Mexia*, 197 S.W.3d 325, 328-29 (Tex. 2006).

[16] *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006) ("[I]t remains the judiciary's responsibility to define the boundaries of [sovereign immunity] and to determine under what circumstances sovereign immunity exists in the first instance.").

[17] *See, e.g.*, *State v. Harper*, 562 S.W.3d 1, 19-20 (Tex. 2018) (holding immunity does not extend to counterclaims for attorney's fees under the Texas Citizens Participation Act); *Reata Constr.*, 197 S.W.3d at 375 (abrogating immunity to the extent the opposing party's claims offset the government's recovery); *cf. City of Galveston v. State*, 217 S.W.3d 466, 471 (Tex. 2007) (cautioning that the nonexistence of immunity "could become a ruse for avoiding the Legislature, [and] courts should be very hesitant to declare immunity nonexistent in any particular case.").

like those in the Texas Tort Claims Act—would have significant public-fisc implications that raise separation-of-powers concerns. Finally, though Hillman arguably has a viable *ultra vires* claim, he has disclaimed any intent to assert one. Accordingly, I agree with the Court that the County is immune from suit in this case and that remand is not appropriate. I write separately, however, to highlight a lacuna in the legislative scheme that neuters the Legislature's efforts to forestall prosecutorial misconduct that could lead to wrongful convictions.

## II

*If impunity is not demolished, all efforts to bring an end to corruption are in vain.*[18]

Taking Hillman's account as true, he was fired for endeavoring to fulfill constitutional and statutory obligations imposed on all prosecutors. By any measure of law and morality in a civilized country, that is wrongful termination. Those we entrust to pursue justice should not be put to the Hobson's choice of earning a living or doing the right thing. Cloaking governmental employers with absolute immunity in such circumstances erodes public confidence in the criminal justice system and undermines concerted legislative efforts to reform that system. By and large, prosecutors are honorable public servants committed to fairness in the administration of justice, but when unlawful practices are tolerated, encouraged, or rewarded with career advantages, others may be enticed to cross the line or may be cowed by consequences visited on those who resist. It's fair to assume that the Legislature did not envision such a consequence when enacting the Morton Act without adopting

---

[18] Rigoberta Menchú Tum, *The Plague of Corruption: Overcoming Impunity and Injustice*, in GLOBAL CORRUPTION REPORT 2001, at 155 (Robin Hodess, Jessie Banfield & Toby Wolfe eds., Transparency Int'l 2001).

7

measures to ensure prosecutors could comply with the Act without losing their jobs. In light of the underbelly this case exposes, it would be appropriate for the Legislature to do so now.

Both *Brady* and the Morton Act obligate prosecutors to disclose certain types of evidence to the defense as a function of due process and to stave off wrongful convictions by thwarting pernicious prosecutorial practices. Wrongful convictions, as numerous studies have shown, come at a significant cost to our society. Financial burdens on the taxpayers accumulate through "an appeal, an appellate reversal, a retrial, investigational efforts to trace the real offender, possible civil lawsuits, and compensatory payments."[19] While we can calculate economic losses from wrongful convictions—for example, the state has paid more than $93 million in compensation to 101 men and women who were wrongfully sent to prison over the past 25 years[20]—the true cost is immeasurable. There is simply no way to restore lost time, no reset button that erases the financial and emotional consequences to the wrongfully incarcerated and their families.

On the other side of the coin, for every innocent person that sits in jail, a criminal roams free. Free to commit more crimes. If DNA-exoneration cases are any kind of indicator, the societal consequences of convicting the wrong person—however it happens—are devastating. For example,

---

[19] CENTER FOR PROSECUTOR INTEGRITY, AN EPIDEMIC OF PROSECUTOR MISCONDUCT at 8-9 (2013), http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutorMisconduct.pdf.

[20] Johnathan Silver & Lindsay Carbonell, *Wrongful Convictions Have Cost Texans More Than $93 Million*, TEXAS TRIBUNE (June 24, 2016), https://www.texastribune.org/2016/06/24/wrongful-convictions-cost-texans-over-93-million/.

out of 325 DNA-exoneration cases from 1989 to 2014, 68 of the true perpetrators later committed an additional 142 violent crimes—including 77 rapes, 34 homicides, and 31 other violent crimes.[21]

With such grave consequences, the best defense is a good offense. The Morton Act is a strong foundation, but more is required to ensure that those wielding power use it as the founders intended. Prosecutors are on the forefront of avoiding wrongful convictions and ameliorating the ensuing societal costs. Based on data complied by the National Registry of Exonerations, official misconduct ranks second among the top five factors contributing to exonerations, leading to over half of the 2,401 (and counting) exonerations since 1989.[22] The most common type of official misconduct involves concealing exculpatory evidence.[23]

While multiple external forces are aimed at ensuring accountability for misconduct—including professional discipline,[24] potential criminal charges,[25] and loss of elected office—this case epitomizes the limits of existing accountability measures. Research shows

---

[21] Emily West & Vanessa Meterko, *Innocence Project: DNA Exonerations, 1989-2014: Review of Data and Findings from the First 25 Years*, 79 ALB. L. REV. 717, 723, 731-32 (2016).

[22] *% Exonerations by Contributing Factor*, NATIONAL REGISTRY OF EXONERATIONS, http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx (last visited Mar. 1, 2019).

[23] NATIONAL REGISTRY OF EXONERATIONS, EXONERATIONS IN 2017, at 6 (2018), http://www.law.umich.edu/special/exoneration/documents/Exonerationsin2017.pdf.

[24] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.04(a), 3.09(d), 8.04(a), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A.

[25] *See, e.g.*, TEX. PENAL CODE §§ 37.09 (tampering with or fabricating physical evidence), .10 (tampering with governmental records), 39.03(a)(2) (abuse of official capacity).

professional discipline and criminal charges are rarely imposed for prosecutorial misconduct.[26] Even in the rare instances when misconduct is uncovered, it usually does not surface until after an innocent person has stayed in prison for years,[27] presenting time-based challenges to any investigation or prosecution of wrongdoing. The possibility of some adverse consequence in some future public election has even less force as a deterrent[28] and, more importantly, does absolutely nothing to alleviate irreparable harm resulting from the wrong.

*Brady* violations are difficult to uncover because, by definition, they involve concealment of evidence in the prosecution's exclusive possession and control.[29] Indeed, exposure of *Brady* violations generally requires the prosecution's own admission, some "chance discovery" by the defense team, or "dumb luck."[30] The most effective way to combat prosecutorial misconduct is to provide a disincentive extrinsic to an individual prosecutor's own moral compass. "Ironically,

---

[26] *See, e.g.*, Gerald S. Reamey, *The Truth Might Set You Free: How the Michael Morton Act Could Fundamentally Change Texas Criminal Discovery, or Not*, 48 TEX. TECH L. REV. 893, 920, 924 (2016); Lesley E. Williams, *The Civil Regulation of Prosecutors*, 67 FORDHAM L. REV. 3441, 3472-77 (1999); *see also* Brandi Grissom, *Study: Prosecutors Did Not Face Discipline for Misconduct in Cases*, TEXAS TRIBUNE (Mar. 29, 2012), https://www.texastribune.org/2012/03/29/study-prosecutors-not-disciplined-misconduct/.

[27] Of the 54 DNA-exonerated wrongful convictions attributable to official misconduct, most of the wrongfully convicted spent at least 10 years in prison. *Featured Cases*, INNOCENCE PROJECT, https://www.innocenceproject.org/all-cases/#government-misconduct,exonerated-by-dna (last visited Mar. 1, 2019).

[28] George A. Weiss, *Prosecutorial Accountability After* Connick v. Thompson, 60 DRAKE L. REV. 199, 222-23 (2011).

[29] Rachel E. Barkow, *Organizational Guidelines for the Prosecutor's Office*, 31 CARDOZO L. REV. 2089, 2093 (2010) (noting "the biggest problem" with *Brady* violations "is that most violations are never discovered in the first place" because "[d]efendants often have no way of knowing whether a prosecutor is in possession of exculpatory evidence that should be disclosed under *Brady*").

[30] Don J. Degabrielle & Eliot F. Turner, *Ethics, Justice, and Prosecution*, 32 REV. OF LITIG. 279, 286-88 (2013).

the only one who can act as a check on the prosecution is the prosecution itself."[31]  This case places the internal dynamics within the prosecutor's office under a microscope.  Although many district attorney's offices have implemented internal guidance or best practices,[32] when the pressure to withhold evidence comes from the top, internal guidelines are at best a window dressing.[33]  Under circumstances like those alleged here, it is imperative that honest prosecutors not be punished.

Absent legislative action, the best someone in Hillman's position could hope for is to seek prospective equitable relief under an *ultra vires* theory.[34]  An ultra vires claim can be brought against a state official if the officer "acted without legal authority."[35]  Although a district attorney has discretion to fire subordinates,[36] one could argue there is no discretion to undertake such an action if it "conflicts with the law."[37]  If Hillman had not opposed consideration of his claims under an *ultra vires* theory, I would remand in the interest of justice to allow him to pursue that claim.

However, as a policy matter, I am dubious that a remedy limited to prospective equitable relief is strong enough to deter the egregious conduct alleged here.  To be effective, the remedy must

---

[31] Texas Criminal Defense Lawyer's Association's Amicus Brief at 4.

[32] TEXAS APPLESEED & TEXAS DEFENDER SERVICE, TOWARDS MORE TRANSPARENT JUSTICE: THE MICHAEL MORTON ACT'S FIRST YEAR 19-20 (2015), https://www.texasappleseed.org/sites/default/files/2015MortonAct-FinalReport.pdf.

[33] Williams, *supra* note 26, at 3477-78 ("Prosecutors' offices would seem to know best what prosecutors do, but they may be inherently too biased to ensure fair disciplinary review.").

[34] *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 376 (Tex. 2009) ("[A] claimant who successfully proves an ultra vires claim is entitled to prospective injunctive relief . . . .").

[35] *Id.* at 372.

[36] TEX. GOV'T CODE § 41.105.

[37] *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158, 162-63 (Tex. 2016).

be proportional to the wrong.  To my mind, the threat of other consequences, including monetary relief, would provide the external pressure required to motivate vigilance and self-policing.  The Legislature is better suited, and constitutionally constituted, to weigh the policy interests that bear on whether to waive immunity (and to what extent),[38] but as to that matter, this case makes painfully clear that what's past is prologue.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: March 15, 2019

---

[38] *Heinrich*, 284 S.W.3d at 377 (noting the Legislature "can authorize retrospective relief if appropriate" and citing as an example section 180.006 of the Texas Local Government Code, which was enacted after *City of Houston v. Williams*, 216 S.W.3d 827 (Tex. 2007), and waived immunity for firefighters' and police officers' claims for back pay and civil penalties).