**Reversed and Rendered and Opinion filed April 23, 2024.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-23-00550-CV**

---

**JAMES ROBERT JONES AND ALLEN WATSON, Appellants**

**V.**

**JOHN WHITMIRE, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF HOUSTON, ET AL., Appellees**

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-76931**

## OPINION

The City Charter requires City Council to allocate a certain amount of ad valorem tax revenue to the Drainage Fund. The question presented in this case is whether City Council has been making the required allocation. The short answer is "no."

## BACKGROUND

The Dedicated Drainage and Street Renewal Fund—sometimes known simply as the Drainage Fund, or alternatively, as ReBuild Houston—was established to change the way that the City of Houston finances its public drainage projects. The City's former practice was to issue bonds and incur new debts, but with the initiation of the Drainage Fund, the City has shifted to a "pay-as-you-go source of funding" that relies on developer impact fees, drainage charges, third party grants, and property taxes.

This last source of funding is the focus of the current dispute. Under the terms of the City Charter, the City Council must approve an annual budget that allocates to the Drainage Fund "an amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy minus an amount equivalent to debt service for drainage and streets for any outstanding bonds or notes issued prior to December 31, 2011, and bonds or notes issued to refund them." Houston City Charter art. IX, § 22(b)(iii).

For Fiscal Year 2020, the City Council determined that the Charter required an allocation of approximately $46 million in ad valorem tax revenues to the Drainage Fund. The City Council approved a budget with that allocation.

That budget prompted a challenge from the two plaintiffs below, both of whom are property owners who reside within the City's limits and who pay their share of ad valorem taxes (collectively, the Taxpayers). Relying on the same provision in the Charter but applying a different methodology, the Taxpayers believed that the City Council should have budgeted an allocation of more than $96 million in ad valorem tax revenues to the Drainage Fund.

The Taxpayers sued the mayor and members of City Council in their official capacities (collectively, the Officials).[1] The Taxpayers sought a declaration that the Officials must fund the Drainage Fund according to the formula stated in the City Charter. The Taxpayers also sought injunctive and mandamus relief against the Officials, insofar as the Officials were allegedly acting ultra vires by underfunding the Drainage Fund.

The Officials filed a plea to the jurisdiction in which they asserted their governmental immunity. They also argued that the Taxpayers could not establish the ultra vires exception to this immunity. The Officials explained that they had not actually underfunded the Drainage Fund. They also explained that the appropriations process entailed a complex series of calculations, which in turn afforded them a certain level of discretion. And due to that discretion, the Officials argued that their actions were within their legal authority, and not ultra vires.

The trial court denied the plea to the jurisdiction, and the Officials brought an interlocutory appeal to this court, where they argued for the first time that the Taxpayers lacked standing to bring their suit. This court agreed with the Officials' standing argument and rendered judgment dismissing the Taxpayers' suit for want of jurisdiction, without ever reaching the question of governmental immunity.

The Taxpayers then challenged this court's standing decision in a petition for review, which the Texas Supreme Court granted. The Supreme Court reversed this court's judgment and concluded that the Taxpayers had standing. In the interest of

---

[1] At the time of the Taxpayers' original petition, the mayor was Sylvester Turner. Because he no longer holds that office, we have substituted Sylvester Turner with his successor, John Whitmire. *See* Tex. R. App. P. 7.2(a). The remaining members of City Council, after making similar substitutions where necessary, are Sallie Alcorn, Twila Carter, Martha Castex-Tatum, Mario Castillo, Willie Davis, Carolyn Evans-Shabazz, Fred Flickinger, Mary Nan Huffman, Tarsha Jackson, Abbie Kamin, Joaquin Martinez, Amy Peck, Letitia Plummer, Edward Pollard, Julian Ramirez, and Tiffany D. Thomas.

judicial economy, the Supreme Court also considered the question of governmental immunity. Due to gaps in both the briefing and the evidence, the Supreme Court opined that the Officials had not conclusively established "precisely how [they] calculated the allocation, whether they did so in the manner they themselves argue the Charter requires, or whether their calculation method conforms to the Charter's requirements." The Supreme Court then remanded the case to the trial court to consider whether the Officials were properly allocating ad valorem tax revenues to the Drainage Fund. *See Jones v. Turner*, 646 S.W.3d 319, 327–28 (Tex. 2022).

Upon remand, each side produced evidence and moved for summary judgment. The trial court granted the Officials' motion, which was also styled as a plea to the jurisdiction.

The Taxpayers now appeal from that final ruling.

## ANALYSIS

The Officials based their dispositive motion on an assertion of governmental immunity. That immunity generally deprives a trial court of jurisdiction, except where a claimant has sought prospective relief against an officer of the government whose actions are ultra vires—i.e., occurring outside of the officer's legal authority. *See Houston Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016).

The Taxpayers invoked that exception in the trial court. They alleged that the Officials had no legal authority to violate the City Charter and that the Officials had acted ultra vires by not allocating the proper amount of ad valorem tax revenues to the Drainage Fund, as required by the Charter.

4

The Officials challenged this allegation in their motion. They argued that their methodology complied with the City Charter, and they produced evidence showing that their allocations conformed with their methodology.

In their opposing motion, the Taxpayers argued that the Officials' methodology was incorrect. The Taxpayers also argued that the evidence conclusively established that the Officials' allocations were improper.

The parties do not dispute each other's evidence. Rather, they dispute which side has employed the correct methodology. Resolution of that dispute turns on an interpretation of the City Charter, which is a purely legal question for this court to decide.

Before we answer that question, we first present a detailed discussion of the parties' competing interpretations, followed by a comparative demonstration of their respective methodologies.

## I.     The Officials' Methodology

The Officials arrive at their allocation using three steps.

### A.     Step One

The starting point is Article IX, Section 22, Subsection (b)(iii), which is the provision in the Charter that requires an allocation to the Drainage Fund in "an amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy."

All parties agreed in their underlying motions that this language employs a term of art. The standard method of designating the amount of a tax levy is in terms of an amount per $100 of the value of the property being taxed. Thus, the reference to $0.118 means 11.8 cents for every $100 of the tax base.

With that technical understanding in mind, the Officials calculate the proceeds due under Step One by multiplying the tax base by $0.118, and then by dividing the product by $100. So, for a brief example, in Fiscal Year 2012, when the tax base was $132,686,318,383, the Officials calculated the proceeds due under Step One at $156,569,856. And in Fiscal Year 2013, when the tax base had grown to $136,060,915,932, the Officials calculated the proceeds due under Step One at $160,551,881.

## B.     Step Two

The next step is much longer and requires a consideration of Article III, Section 1 of the Charter, which is otherwise known as the Revenue Cap. This provision limits the City's collection of ad valorem tax revenue, and the process by which it achieves that limitation is somewhat complicated.

The ad valorem tax revenue, or levy, is the product of two variables: the tax base and the tax rate. The tax base is determined by the appraisal districts in the three counties where the City exercises its territorial jurisdiction. The tax rate, on the other hand, is determined by the Officials.

The Officials have some discretion in setting the tax rate, but that discretion is limited by the Revenue Cap, which provides that, absent voter approval to the contrary, the Officials may not levy taxes at rates expected to result in revenues that exceed the lower of two different indexed amounts. The first indexed amount is the amount of "allowable ad valorem tax revenues increased by the rate of inflation . . . plus the rate of growth in the City's population . . . but not less than zero." And the second indexed amount is the "amount of total ad valorem taxes, both current and delinquent, actually collected during the prior fiscal year, increased by 4.5% of that amount." Houston City Charter art. III, § 1.

What this all means is that if property values appreciate and the appraisal districts determine that the tax base has increased from one year to the next, then the Officials might be required to lower the tax rate from the previous year so that the expected ad valorem tax revenue does not exceed a certain amount, as determined by the lower of two indices. The City's collection of ad valorem tax revenue can still grow from the previous year, but the Revenue Cap operates by restricting the rate of that growth.

There is an allusion to the Revenue Cap in Article IX, Section 22, Subsection (d)—just below the subsection cited in Step One of the Officials' methodology. Subsection (d) provides as follows: "Funding for the Dedicated Drainage and Street Renewal Fund that is not derived from ad valorem taxes levied by the City (i.e., that portion derived from fees, charges and third party payments) shall not be included in those revenues limited by this Charter."

The Officials construe this provision to mean that the Revenue Cap applies not just to the general collection of ad valorem tax revenue into the City's coffers, but also to the allocation of ad valorem tax revenue into the Drainage Fund. In other words, the Officials assert that the Revenue Cap operates on Article IX, Section 22, Subsection (b)(iii).

The Officials explain that if the Revenue Cap requires them to lower the tax rate in order to limit the growth rate of ad valorem tax revenue, then Subsection (d) also requires them to limit the growth rate of any allocations into the Drainage Fund.

The process by which the Officials determine these limitations is complex. Because allocations into the Drainage Fund first began in Fiscal Year 2012, the Officials use the allocation from that year as their base number. For each year thereafter, the Officials increase that allocation according to the indexed calculations set forth in the Revenue Cap, if the Revenue Cap is actually triggered.

7

In lieu of detailed worksheets, the Officials provide a chart containing a glimpse of their calculations. We reproduce that chart here:

| Fiscal Year | Inflation/ Population % | (i) Inflation/ Population Calculation | Lower of | 4.5% | (ii) 4.5% Calculation | Amount allocated to DDSRF before debt service subtracted |
|---|---|---|---|---|---|---|
| 2012 | | 156,570 | | | 156,570 | 156,570 |
| 2013 | 5.433% | 165,076 | OR | 4.5% | 163,615 | 160,552 |
| 2014 | 2.585% | 169,344 | OR | 4.5% | 170,978 | 177,960 |
| 2015 | 3.270% | 174,881 | OR | 4.5% | 176,964 | 199,501 |
| 2016 | 4.777% | 183,236 | OR | 4.5% | 182,751 | 182,751 |
| 2017 | 1.871% | 186,664 | OR | 4.5% | 190,974 | 186,664 |
| 2018 | 3.201% | 192,639 | OR | 4.5% | 195,064 | 192,639 |
| 2019 | 2.362% | 197,188 | OR | 4.5% | 201,308 | 197,188 |
| 2020 | 2.941% | 202,988 | OR | 4.5% | 206,062 | 202,988 |
| 2021 | 1.046% | 205,111 | OR | 4.5% | 212,122 | 205,111 |
| 2022 | 0.000% | 205,111 | OR | 4.5% | 214,341 | 205,111 |
| 2023 | 3.574% | 212,442 | OR | 4.5% | 214,341 | 212,442 |

The numbers in columns three, six, and seven are truncated amounts expressed in thousands of dollars. So, in row two, which corresponds to Fiscal Year 2012, those numbers are shorthand for roughly $156,570,000 (which is also the number from the calculation in Step One, rounded up). As stated above, because Fiscal Year 2012 is when allocations to the Drainage Fund first began, this amount represents the base number in the Officials' indexed calculations.

Columns two and three relate to the first index. Column two represents the sum of the rate of inflation and the rate of population growth. Column three represents the increase from the previous year's amount, as determined by the rate in column two. So, for Fiscal Year 2013, the Officials took the base amount from Fiscal Year 2012 and increased it according to the percentage in column two

8

(156,570 × 1.05433 = 165,076). That same methodology was continued for each year thereafter. So, for Fiscal Year 2014, the Officials took 165,076 (the amount from Fiscal Year 2013) and multiplied it by 1.02585 (the sum of 1 and the indexed rate) to arrive at 169,344 (which was rounded up after the truncation). And so on and so forth.

Columns five and six relate to the second index. Because this index fixes the rate of growth at 4.5%, that percentage appears in the entirety of column five. Column six applies that percentage to whichever number in column three or six of the previous year happens to be lower. For most years, except at the very beginning, this lower amount also appears in column seven of the previous year. In Fiscal Year 2012, the amounts in columns three and six were the same, because that was the base year. So for Fiscal Year 2013, that base number was simply multiplied by 1.045 to arrive at 163,615. Moving forward to Fiscal Year 2014, that same rate of growth was applied to the number in column six of the previous year (163,615) because that number was lower than the number appearing in column three of the previous year (165,076). The indexed calculation accordingly returned a value of 170,978, which is the product of 163,615 and 1.045. For Fiscal Year 2015, the growth rate was applied to the number in column three of the previous year (169,344) because that number was lower than the number in column six (170,978). This indexed calculation returned a value of 176,964, which is the product of 169,344 and 1.045. This comparative index continued year after year.

Column seven represents the allocation amount before the subtraction of debt service obligations. The amounts in this column are determined by factors that are not immediately apparent. For Fiscal Years 2012 through 2014, the Revenue Cap was not triggered at all, so the amounts appearing in column seven were not determined by either of the indexed calculations. They were instead determined by

9

the calculations performed in Step One. For Fiscal Year 2015, the Officials have asserted that the Revenue Cap was not triggered, but the Taxpayers have asserted the opposite. We cannot reconcile this conflict—on the one hand, the number in column seven does not match either of the numbers from columns three or six, which would suggest that the Revenue Cap was not triggered, just like in the previous years; but on the other hand, the record also establishes that the tax rate dropped from $0.63875 to $0.63108, which would suggest that the Revenue Cap was triggered. Resolution of this conflict is ultimately unnecessary for our purposes. Moving on to Fiscal Year 2016 and for every year thereafter, there is no dispute that the Revenue Cap was triggered, and the allocation to the Drainage Fund was determined by whichever number in column three or column six of the same year was lower.

For those years in which the Revenue Cap was not triggered, the Officials applied the full 11.8 cents multiplier from Step One (not the indexed calculations of Step Two). That multiplier equated to roughly 18.47% of the tax rate, which at that time was $0.63875. But ever since the Revenue Cap has been triggered, the tax rate has incrementally fallen. For example, in Fiscal Year 2016, the tax rate was reduced to $0.60112, and for Fiscal Year 2017, it was reduced again to $0.58642. Had the Officials continued to apply the full 11.8 cents multiplier in Step One (instead of applying the indexed calculations of Step Two), the multiplier's ratio to the falling tax rate would have grown from that original 18.47% to more than 20%, meaning that the Drainage Fund would have effectively occupied an ever larger share of the Officials' overall budget.

But by applying the indices of the Revenue Cap to the allocation formula for the Drainage Fund, the Officials have effectively kept that multiplier in proportion to the falling tax rate, using Fiscal Year 2012 as a base. For Fiscal Year 2015, the Officials calculated the multiplier as being the effective equivalent of just 11.658

cents (18.47% of the tax rate of $0.63108). For Fiscal Year 2016, the Officials calculated the multiplier as having effectively fallen to 11.105 cents (18.47% of the tax rate of $0.60112). And for Fiscal Year 2017, that multiplier had effectively fallen again to 10.833 cents (18.47% of the tax rate of $0.58642). The Officials have dubbed these indexed multipliers as the "11.8 cents equivalent."

## C. Step Three

In the final step, the Officials make a deduction for debt service obligations, as required by Article IX, Section 22, Subsection (b)(iii).

The calculations in this step also depend on the Revenue Cap. If the Revenue Cap has not been triggered, then the deduction is made to the amount produced in Step One, and the calculations in Step Two are not considered. Otherwise, the deduction is made to the amount produced in Step Two and the calculation in Step One is not considered. The balance after the deduction is then deposited into the Drainage Fund.[2]

## II. The Taxpayers' Methodology

The Taxpayers agree with the Officials that the proceeds of the ad valorem tax levy should be calculated by multiplying the tax base by $0.118 and then dividing by $100, which is the same operation that the Officials performed in Step One of their methodology. The Taxpayers also agree with the Officials' calculations of the debt service obligations, which were considered in Step Three of their methodology. But the Taxpayers disagree with any application of the indexed calculations from

---

[2] For Fiscal Year 2016 only, the Officials claim that they made a supplemental allocation to the Drainage Fund after all of these calculations were performed—notwithstanding the limitations they claim are imposed by Article IX, Section 22, Subsection (d).

Step Two of the Officials' methodology, which the Taxpayers would not perform at all.

In effect, the Taxpayers would determine the allocation for each fiscal year by using the following algebraic equation:

$$Allocation = \left(Tax\ Base * \frac{\$0.118}{\$100}\right) - Debt\ Service$$

The Taxpayers also present an alternative equation that does not use the tax base as a variable because, as they assert, there might be collection problems with delinquent portions of the tax base, or because the tax base can fluctuate as appraisal contests are finalized or as properties are added or removed from the tax rolls. For their alternative equation, the Taxpayers recall that the tax levy is the revenue that has actually been collected, which is equal to the tax base multiplied by the tax rate (expressed as a dollar amount for every $100 of property value).

$$Tax\ Levy = Tax\ Base * \frac{Tax\ Rate}{\$100}$$

From this expression, the tax base can be isolated by multiplying each side of the equation by $100 and then by dividing by the tax rate:

$$Tax\ Base = Tax\ Levy * \frac{\$100}{Tax\ Rate}$$

And then from that expression, there can be a substitution of the tax base variable in the earlier allocation equation:

$$Allocation = \left(Tax\ Levy * \frac{\$100}{Tax\ Rate}\right) * \left(\frac{\$0.118}{\$100}\right) - Debt\ Service$$

Finally, that equation can be simplified by canceling out the $100, which is common to the fraction's numerator and the denominator:

$$Allocation = \left(\frac{Tax\ Levy * \$0.118}{Tax\ Rate}\right) - Debt\ Service$$

### III.  Demonstrative Calculations

In this section, we apply these competing methodologies to data from Fiscal Year 2020, because that was the example given in the Taxpayers' live pleading.

The Officials have not specifically identified the tax base for this year, but the record contains one indication that the adjusted taxable value was $211,296,316,412. For demonstrative purposes only, we will assume that this number represents the tax base.

Under Step One, the Officials would multiple that tax base by $0.118 and then divide by $100, to return an amount of $249,329,653.

Under Step Two, the Officials would perform the indexed calculations, and as indicated by the chart above, the lower amount of those indexed calculations was a truncated $202,988,000.

Under Step Three, the Officials would subtract the debt service obligations either from the amount in Step One if the Revenue Cap had not been triggered, or from the amount in Step Two if the Revenue Cap had been triggered. Because the Revenue Cap had been triggered in Fiscal Year 2020—the tax rate dropped from $0.58831 to $0.56792—the Officials would proceed with the amount from Step Two and disregard the amount from Step One. According to their other calculations, the truncated amount of the debt service obligations was $156,511,000. When that amount is subtracted from the amount in Step Two, the balance is a truncated $46,476,000, which the Officials actually allocated to the Drainage Fund.

In their live pleading, the Taxpayers approximated the tax base in Fiscal Year 2020 as being a truncated $214,060,000,000. But for the sake of consistency between

13

these demonstrative calculations, we will still assume that the tax base was $211,296,316,412.

The Taxpayers would multiply that tax base by $0.118 and then divide by $100, just as the Officials did in Step One, to return an amount of $249,329,653. Then the Taxpayers would subtract the debt service obligations, which they projected to be $155,855,000 in their live pleading, but for purposes of this demonstration, we will still use the truncated amount supplied by the Officials, which was $156,511,000. When that latter amount is subtracted from $249,329,653, the balance is more than $92 million—which is not far from the $96 million that the Taxpayers projected in their live pleading—and the Taxpayers believe that this amount should have been allocated to the Drainage Fund.

We acknowledge that the numbers used in these calculations may not be exact, but the point of the demonstration is that the difference in allocation between the two methodologies is not de minimis.

The Officials acknowledge this point too. They have produced charts comparing the Taxpayers' methodology, which they characterize as allocating the "full 11.8 cents," with their own methodology, which only allocates the "11.8 cents equivalent." By the Officials' own calculations, when the "11.8 cents equivalent" methodology is used over twenty years, the Drainage Fund suffers a budget shortfall of several billion dollars.

## IV. De Novo Review

We construe charter provisions in the same manner that we construe statutes. *See Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Our primary objective is to ascertain and give effect to the intent of the drafters, and in making that determination, we begin with the words that were

chosen. *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004). When those words are not defined in the charter itself, we assign them their ordinary meaning, unless a different or more precise meaning is apparent from the context. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). Our review is de novo. *See Am. Nat'l Ins. Co. v. Arce*, 672 S.W.3d 347, 354 (Tex. 2023).

The main charter provision here is Article IX, Section 22, Section (b)(iii), which requires an allocation of "an amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy minus an amount equivalent to debt service for drainage and streets for any outstanding bonds or notes issued prior to December 31, 2011, and bonds or notes issued to refund them."

As stated earlier, the first half of this provision uses a term of art when it refers to "proceeds from $0.118 of the City's ad valorem tax levy." That phrase does not mean a total or gross allocation in an amount just shy of twelve cents. Rather, when understood in its proper context of taxation, this phrase means an amount calculated at $0.118 for every $100 of taxable property value, where taxable property value is the tax base or the amount subject to the City's ad valorem tax rate.

The parties have uniformly understood the phrase to have this meaning through the course of the litigation. Both of their methodologies apply this understanding. And the Supreme Court, in its discussion of this charter provision, never suggested that the parties' mutual understanding was incorrect. *See Jones*, 646 S.W.3d at 321 ("The standard method of designating the amount of the tax levy is in terms of an amount per $100 of the value of the property being taxed (e.g., in 2010, the tax rate was $0.63875 per $100 of valuation). Accordingly, the parties

agree that Section 22's reference to $0.118 means 11.8 cents per $100 of property value.").[3]

The parties also agree about the meaning of the second half of this provision, which requires a deduction for debt service obligations. We agree with the parties that their understanding comports with the text of the provision.

That leaves the critical question for which the parties are not in consensus—whether a different methodology that considers the indexed calculations of the Revenue Cap is required by Article IX, Section 22, Subsection (d). We reproduce that subsection here: "Funding for the Dedicated Drainage and Street Renewal Fund that is not derived from ad valorem taxes levied by the City (i.e., that portion derived from fees, charges and third party payments) shall not be included in those revenues limited by this Charter."

We agree with the Officials that the last portion of Subsection (d) refers to the Revenue Cap, but we disagree with the Officials about the consequence of this reference. By its plain terms, Subsection (d) establishes that three sources of revenue for the Drainage Fund are not subject to the limitations created by the Revenue Cap. There are only four total sources of revenue for the Drainage Fund—all of them

---

[3] The Officials assert that the Supreme Court made a "very glaring error" when it parenthetically likened the tax levy to the tax rate. The Officials insist that these two variables are nothing alike because the tax levy refers to the revenue, whereas the tax rate refers to a multiplier used for arriving at the revenue. We do not believe that the Supreme Court has made the blunder that the Officials have insinuated. As we read its opinion, the Supreme Court was not suggesting that the tax levy and the tax rate were the same. Rather, the Supreme Court was saying that the charter provision's reference to $0.118 was expressed in the same manner or units as a tax rate—i.e., as an amount per $100 of property value—and that a portion equal to that tax rate multiplied by the tax base must be set aside from the larger tax levy for allocation to the Drainage Fund. This understanding should come as no surprise to the Officials. In their own worksheets for Fiscal Years 2012 and 2013—which, from what we can tell, are the only worksheets in the record that properly detail with complete, non-truncated amounts every single calculation, step-by-step, used to arrive at the Drainage Fund allocation—the Officials similarly labeled the 11.8 cents multiplier as the "applicable tax rate."

16

enumerated in Subsection (b)—and the only one of those four that Subsection (d) declines to carve out from the Revenue Cap is the revenue derived from ad valorem taxes. Subsection (d) effectively implies what the Revenue Cap already makes explicit, which is that the revenue from the ad valorem tax levy must be capped.

The Officials would have us believe that Subsection (d) has an additional effect—namely, that it makes the indexed calculations of the Revenue Cap applicable to the allocation calculation of Subsection (b)(iii), which also concerns the ad valorem tax levy. But there is no textual basis for such an interpretation. Nothing in Subsection (b)(iii) references the indexed calculations of the Revenue Cap, and nothing in Subsection (d) references the allocation calculation of Subsection (b)(iii). These provisions are separate because they serve separate functions. Subsection (d) and the Revenue Cap address the *collection* of revenue through the ad valorem tax levy, whereas Subsection (b)(iii) addresses the *allocation* of that revenue after it has already been collected.

The Officials still insist that their methodology is correct because the Supreme Court recited the parties' agreement that the Revenue Cap must be taken into consideration in calculating the allocation amount for the Drainage Fund. *See Jones*, 646 S.W.3d at 326 ("Taxpayers and the City Officials agree that the revenue cap must be taken into consideration in calculating the Fund allocation."). But through this recitation, the Supreme Court did not hold—or even hint—that the indexed calculations of the Revenue Cap are applicable to Subsection (b)(iii).

The indexed calculations of the Revenue Cap must be considered when the Officials determine the tax rate. And in that sense, the Revenue Cap does have an impact on the Drainage Fund because $0.118 of the tax rate must be set aside for the Drainage Fund. But the plain text of Subsection (b)(iii) requires this allocation after applying the full 11.8 cents multiplier, not the Officials' "11.8 cents equivalent."

17

This allocation method is demonstrated by the Taxpayers' alternative algebraic equation, which expresses the allocation formula in terms of the tax levy and the tax rate, instead of the tax base.

The Officials also defend their methodology with *Hotze v. Turner*, 672 S.W.3d 380 (Tex. 2023), in which the Supreme Court upheld an unchallenged ruling that the City had complied with the terms of the Revenue Cap. *Id.* at 388. But that case considered election issues with the Revenue Cap. It was completely silent as to the Drainage Fund, and it has no application here.

In sum, we conclude that the Officials' methodology is legally incorrect, and the evidence conclusively establishes that their misallocations are ultra vires. The Officials should be allocating an amount to the Drainage Fund that applies the full 11.8 cents multiplier, not the so-called "11.8 cents equivalent," which is anything but equivalent.

## V. Remaining Issues

The Officials make two additional arguments.

First, in the event we hold that their methodology does not comply with the terms of the Charter, the Officials argue that they are nonetheless entitled to their governmental immunity because their methodology was fully within their authority to interpret and enforce the Charter. The Officials are correct insofar as they suggest that an act within their discretion is not ultra vires, even when the exercise of that discretion happens to be erroneous. *See Hall v. McRaven*, 508 S.W.3d 232, 242–43 (Tex. 2017). But the Officials generally have no discretion to misinterpret the law. *See Houston Belt*, 487 S.W.3d at 163. And as concerning the specific facts of this case, the Supreme Court has already held that the "Officials have no discretion but to allocate the funds as mandated: either they have properly allocated the funds, or

they have not." *See Jones*, 646 S.W.3d at 326. For the reasons explained above, we conclude that the Officials have acted ultra vires by not making the proper allocations.

Second, the Officials argue that they must retain their governmental immunity because the Taxpayers have only alleged that City Council, as a collective body, approved a budget that underfunded the Drainage Fund, without considering whether any individual member of City Council voted for or against that budget. The Officials believe that the Taxpayers have failed to plead a valid ultra vires claim because, as they assert, "a legislative body's collective action does not give rise to individual waiver under the ultra vires exception."

The only authority that the Officials cite for this argument is *Kilgore Independent School District v. Axberg*, 535 S.W.3d 21 (Tex. App.—Texarkana 2017, no pet.). In that case, the plaintiffs sued the trustees of a school board for voting to repeal a local option homestead exemption, which the plaintiffs believed was beyond the trustees' authority. The court of appeals determined that the plaintiffs had only challenged an act by a collective body—i.e., a vote by the board of trustees—not an act by an individual trustee, because no trustee had the authority to independently repeal the local option homestead exemption. The court of appeals then concluded that the plaintiffs had failed to plead a valid ultra vires claim because the board of trustees, as a collective body, had the authority to act by voting. *Id.* at 31–32.

We are not bound by *Axberg*, and we decline to apply the Officials' reading of it here. Instead, we choose to follow the precedent of the Texas Supreme Court, which has already recognized that a claimant can validly plead an ultra vires claim against the members of City Council when that collective body fails to make allocations that are required by law. *See City of Houston v. Houston Municipal*

19

*Employees Pension Sys.*, 549 S.W.3d 566, 580 (Tex. 2018) (concerning the City's obligation to make periodic payments to a pension fund).

## CONCLUSION

We reverse the trial court's judgment in favor of the Officials and render declaratory judgment that:

a. The Officials cannot reduce the proceeds from the City's ad valorem tax levy allocated to the Drainage Fund under Article IX, Section 22, Subsection (b)(iii) of the City Charter to an amount less than 11.8 cents per $100 of taxable value, except to the extent such total amount of proceeds is reduced by the amount of the City's debt service obligations; and

b. While the Revenue Cap may affect the total tax rate (and thus, the total ad valorem tax levy), the Officials cannot otherwise employ the Revenue Cap in calculating the "amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy" under Article IX, Section 22, Subsection (b)(iii) of the City Charter.

We also enjoin the Officials from allocating to the Drainage Fund an amount less than 11.8 cents per $100 of taxable value less the amount of the debt service obligations.

Because the Taxpayers have obtained an adequate remedy by appeal, we deny their request for mandamus relief.


/s/     Tracy Christopher
        Chief Justice


Panel consists of Chief Justice Christopher and Justices Wise and Hassan.

20